STATE of Missouri, Respondent,

v.

Donald L. DIXON, Appellant.

No. WD 37505.

Missouri Court of Appeals,
Western District.

Aug. 12, 1986.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
Sept. 25, 1986.

Joseph H. Locascio, Kansas City, for appellant.

William L. Webster, Atty. Gen., Timothy W. Anderson, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P.J., and SHANGLER and KENNEDY, JJ.

TURNAGE, Presiding Judge.

Donald L. Dixon was found guilty by a jury of two counts of murder in the first degree, § 565.003, RSMo 1978 [1] two counts of armed criminal action § 571.015, one count of robbery in the first degree, § 569.020, and one count of burglary in the first degree, § 569.160. Sentence was imposed at life for each of the two counts of murder, three years for each of the two counts of armed criminal action, and ten years for robbery. Each armed criminal action sentence was made concurrent with each murder sentence and the robbery sentence was made concurrent with one of the murder sentences. The two murder sentences were made consecutive. The court dismissed the charge for burglary and set aside the jury's verdict on that count on the ground that conviction on both the murder and burglary counts would subject Dixon to double jeopardy.

Dixon challenges the sufficiency of the evidence and the failure of the court to order the prosecutor to grant use immunity to two witnesses. Affirmed.

On the night of November 26 and in the early morning of November 27, 1983 Dixon and three friends, James Bowman, Anthony Lytle and Jon Smith set out to raise some money by stealing hubcaps or breaking into houses. The evidence most favorable to the state revealed that an elderly couple, Earl and Pauline Chambers, had been killed by multiple stab wounds in their home at 58th and Paseo in Kansas City. Police found the bodies in the bedroom and an investigation revealed a butcher knife which was soiled with the blood of the victims lying near the bodies. The prints of four sets of tennis shoes in mud and blood were found in the same bedroom. The shoe prints were different for each set. Numerous drawers throughout the house had been emptied.

A police detective interviewed Dixon. Dixon first denied knowledge of the crime, but later admitted that he had been in the Chambers' house on the night of the murder. Dixon consented to a search of his room located in his parents' home and a pair of tennis shoes was found. The detective testified that Dixon admitted having worn those tennis shoes on the night he was in the Chambers' home.

Police removed part of the flooring in the bedroom near the bodies which showed some of the four sets of tennis shoe prints. A crime lab technician photographed the prints on the flooring and the soles of the tennis shoes Dixon admitted wearing when he was in the Chambers' home. An overlay of the picture of the sole of Dixon's tennis shoe was placed over the picture of the print on the flooring and the police technician testified that in his opinion Dixon's tennis shoe had made the print on the Chambers' floor. The overlay of the tennis

---

1. All statutory references are to Missouri's Revised Statutes, 1978, unless otherwise stated.

shoe sole on the picture of the print on the floor revealed four points of wear or scuff marks which matched exactly. The tennis shoe print on the floor was made in wet mud and blood.

The state introduced a letter which Dixon had written to Lytle. In the letter Dixon told Lytle that he needed him bad because "all they have is those tennis shoes and my statement in which I lied for all of you." The letter continued "I want you to know that they can't give you any more time, so if you tell them you wore the tennis shoes, nothing will happen." The letter also stated "Anthony, you should have never told them you seen Eddie [Bowman] kill the people...."

Dixon testified at trial and stated that he and his three friends went to the front door of the Chambers' house to determine if anyone was home with a view of possible burglary if no one was there. Dixon testified that when they approached the front door he saw a black male inside with tube socks covered with blood on his hands. Dixon and his friends decided to go a short distance from the house to wait for the man inside to emerge and then take from the man whatever property he was carrying. Dixon stated that a short while later when the man came out of the house Dixon recognized him and spoke with him. The man told Dixon to go in the house and help himself to any property he wanted to take. Dixon and his friends entered the house and Dixon started ransacking through drawers and his friends started to remove two TV sets and a microwave oven. They also encountered a second man in the house. Dixon testified that he never entered the bedroom where the bodies were located but he did see the leg of one of the victims. Dixon stated that when he was in the Chambers' home he was not wearing the tennis shoes found in his room but that he had loaned those shoes to Lytle a few days earlier. At about that time someone in Dixon's party had discovered the bodies and upon announcing that the people were

dead Dixon and his three friends took the two TV sets and microwave oven and fled. Dixon said that he was trying to negotiate the sale of the oven the following day when he learned that the police wanted to talk with him.

Dixon and his three friends were charged separately. In addition the prosecutor filed charges against Michael Cunningham and Rodney Cayson, the two men who Dixon said were in the Chambers' home when he arrived.

Prior to trial Dixon filed a motion requesting the court to require the prosecutor to grant use immunity to Smith and Bowman. A hearing was held on this motion during which it was revealed that an assistant prosecutor had talked with Smith and Bowman on a number of occasions in the presence of their attorney after the prosecutor had promised them use immunity. Use immunity as used in the context of this case was a promise by the prosecutor to Smith and Bowman that he would not use anything said by them against them. The court overruled the motion and when Dixon undertook to depose Smith and Lowman they each refused to testify on grounds of the fifth amendment.

Dixon contends that the court erred in failing to order the prosecutor to grant Smith and Bowman use immunity so that Dixon could produce their testimony in his trial. Dixon contends the failure of the court to do this violated his right of compulsory process and due process. By the time Dixon went to trial the charges against Smith, Bowman, Cunningham and Cayson had been dismissed. No attempt was made by Dixon to secure the evidence of Cunningham and Cayson and no request was made that the prosecutor be ordered to grant use immunity to them.

The assistant prosecutor in his deposition stated that Smith and Bowman had told him identical stories concerning the entry of Dixon and his friends into Chambers' home. A 16 page statement given to the prosecutor by Smith was made available to

Dixon. That statement contains the same account testified to by Dixon that he and his friends were in the Chambers' home. In that statement Smith stated that he did not know whether or not Dixon had taken part in the Chambers' homicide.

■ The contention on appeal is that Dixon was entitled to have the prosecutor forced to grant use immunity to Smith and Bowman so that they could testify to corroborate Dixon's testimony. The question of requiring a prosecuting attorney to grant use immunity so that a person may testify in favor of a defendant who is on trial for a criminal charge has not been presented in Missouri, nor does Missouri have a statute allowing the prosecutor to grant such immunity. The question has arisen in the federal system and the circuits have divided on the question. In *Government of the Virgin Islands v. Smith*, 615 F.2d 964, 973–74[6], (3rd Cir. 1980), the court held that a court has inherent authority to immunize a witness capable of providing clearly exculpatory evidence on behalf of a defendant who has met the conditions set out in that opinion. One of the conditions stated is "[i]mmunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or if it is found to relate only to the credibility of the government's witnesses." *Id.* at 972[5].

In *United States v. Thevis*, 665 F.2d 616 (5th Cir.1982), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), the court concluded that the question of granting use immunity should be decided by the legislative branch rather than by the judiciary. *Id.* at 640. The court left open the question of whether or not a court might require the grant of use immunity in cases in which the government had abused the statutory immunity power.

It is not necessary to decide in this case whether or not a trial court in Missouri has inherent authority to order a prosecutor to grant a witness use immunity so that a defendant can utilize such testimony. It is clear that even if a court were to exercise such power it would have to be done under certain conditions. Those conditions would reasonably require, as stated in *Government of the Virgin Islands, supra*, that the evidence be clearly exculpatory and not cumulative. Here Dixon fails to meet either test. He contends that the testimony of Smith and Bowman would simply corroborate his testimony which means that such evidence would be only cumulative to his own. Further, he does not contend that the evidence from these two witnesses would be clearly exculpatory because both witnesses did place Dixon in the Chambers' home on the night of the murder and would involve him at the very least in the burglary.

Failing to show that the evidence which he sought to produce by the forced grant of use immunity would prove to be exculpatory or nothing more than cumulative, Dixon has failed to meet the threshold test of such doctrine. For that reason it is unnecessary to decide the question of whether the courts have inherent authority to grant use immunity.

■ Dixon next contends the evidence was insufficient to support his conviction for murder and robbery. Dixon argues the evidence contained in his testimony to support his contention. Contrary to that view, in passing on the sufficiency of the evidence, this court considers the facts in evidence and all favorable inferences reasonably drawn therefrom in the light most favorable to the jury verdict and disregards all contrary evidence. *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). This standard of review applies when a circumstantial evidence case is made. *State v. Harris*, 639 S.W.2d 122, 125[7, 8] (Mo.App.1982). Such a case is made when, as in the instant case, the facts and circumstances relied on by the state are consistent with each other while at the same time are inconsistent

with any reasonable theory of innocence. *Id.* Under this standard of review, the evidence revealed the presence of prints made by four different pairs of tennis shoes in the bedroom where the Chambers' bodies were found. The evidence was that the prints were made in wet mud and in blood while it was still wet. The testimony of the technician was that there did not appear to be much coagulation in the blood at the time the tennis shoe prints were made. In addition, he testified that the shoe prints had smeared the blood and from these facts he drew the conclusion that the blood was fairly fresh at the time the shoes came in contact with it.

Dixon admitted that while he was in the Chambers' house he was wearing the tennis shoes which the technician identified as having made one set of shoe prints in the mud and blood in the bedroom. From this evidence the jury could infer that Dixon walked in the blood shortly after the victims were murdered.

From the letter which Dixon wrote to Lytle the jury could infer that Dixon acknowledged that Bowman stabbed the victims. By Dixon's own admission he was with Bowman, Lytle, and Smith when they entered the Chambers' house. The fact that there were four different sets of tennis shoe prints found in the bedroom allowed the jury to infer that four people were in the bedroom, one of whom was Dixon as shown by his shoe print. This evidence was sufficient to allow the jury to find Dixon guilty of murder by at least having aided and assisted in the crime.

To prove the robbery charge it was necessary for the state, under § 569.020, to prove property was forcibly stolen when Dixon or another participant caused serious physical injury to any person or committed other acts which are not relevant here. There is no doubt that the Chambers suffered serious physical injury.

Further, Dixon admitted that the property was not removed until after he had seen the leg of one of the victims. From this the jury could infer the murders preceded the taking of the property.

Dixon argues the evidence was insufficient to support the armed criminal action count because the murder convictions were not supported. The discussion on the murder conviction answers that contention.

The judgment is affirmed.

All concur.