**STATE of Missouri, Respondent,**

v.

**Michael CUNNINGHAM, Appellant.**

**No. WD 40141.**

Missouri Court of Appeals,
Western District.

Nov. 15, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 27, 1988.

Application to Transfer Denied
Feb. 14, 1989.

Sean D. O'Brien, Public Defender, David S. Durbin, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Carrie D. Francke, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

Before FENNER, P.J., and GAITAN and MANFORD, JJ.

FENNER, Presiding Judge.

By verdict of a jury Michael Cunningham was found guilty of two counts of first degree murder, two counts of armed criminal action, first degree robbery and second degree burglary. Punishment was assessed at two consecutive life sentences for the first degree murder counts, two concurrent ten year sentences for the armed criminal action counts, a twenty year sentence for the first degree robbery count, said sentence to run consecutive to the life sentences and seven years on the second degree burglary count, said sentence to also run consecutive to the life sentences.

Cunningham first argues that there was insufficient evidence to sustain the first degree murder convictions. The facts are these: On November 27, 1983, at 10:23 a.m., the 911 emergency hotline received a call that there were prowlers around a house in the area of 58th and Paseo. Police officer Hughes and his partner were dispatched to 5801 Paseo, the residence of Earl and Pauline Chambers. Upon arrival the officers began to search the exterior of the house and found the front door standing open. After calling for a third car the officers stepped inside the house. The house was in disarray and appeared to be ransacked. As he looked to his right, Officer Hughes saw the feet of Pauline Chambers who was lying toes up in one of the bedrooms. He checked for signs of life, but found none. He then saw a second body, that of Earl Chambers, as he entered the doorway to the bedroom. Both of the bodies had what appeared to be blood on them and were lying in a pool of what appeared to be blood. Mr. Chambers also showed no signs of life.

Dr. Bonita Peterson, Jackson County Medical Examiner, performed autopsies and determined the cause of death of the Chambers to be multiple stab wounds.

John Cayton, a forensic examiner made shoe print comparisons from shoes recovered from four suspects, John Keith Smith, Donald Dixon, Anthony Lytle and James Bowman. The shoe prints were compared to prints found on the front door and pieces of flooring from the Chambers' home. A comparison to the shoes of Donald Dixon produced a positive match.

Voice prints were made of the person who made the 911 emergency calls. Steven Cain, a voice print expert from the Department of Treasury, identified appellant, Michael Cunningham as being the person who made six of the seven 911 calls to the police.

A Zenith portable TV belonging to the Chambers was recovered by the police from the home of John Keith Smith. Another TV belonging to the Chambers was recovered from underneath the porch of James Bowman's home.

The State's key witness was Anthony Lytle, a co-participant in the crime. As to the events of November 26, 27, 1983, he testified as follows: At around 10:00 p.m. on November 26, 1983, Anthony Lytle, Donald Dixon, John Keith Smith and James Bowman were driving around in Bowman's car and had a discussion about attending a wedding party. During the course of conversation they decided to commit a burglary. The plan was to go through a neighborhood (near 58th and Paseo) randomly knocking on doors and asking if there was a party inside. If somebody answered the knock they would leave and go on to the next house. At the first few houses people answered the door, so the four left.

Eventually, the four progressed to the Chambers' home at 5801 Paseo where they knew a white couple lived. As they approached the house Lytle noticed a hole in the storm door and a footprint underneath the door knob. Donald Dixon knocked on the door and as he knocked the door pushed closed and pushed Dixon away. Dixon asked if there was a party going at this residence and a male voice replied no there was not. The four men walked away from the residence and as they were leaving Lytle saw somebody in the window. Lytle turned to Smith and said, "I thought you said there was white people staying here," to which Smith replied, "Yes, it is." The men apparently decided that a burgla-

ry was already in progress and decided to take "the stuff" from whoever was in the house.

Smith and Bowman went to get a car and Lytle and Dixon saw a male individual come out of the house with a TV. Lytle and Dixon followed this individual to a place behind a church where the man was hiding things behind a bush. Dixon realized he knew this person and began calling to him, referring to him as Jack. Dixon and Jack agreed that all of them including Bowman and Smith could all go into the house and steal property.

When they all entered the house, there was another guy in there (Cayson) who had not left the house. Lytle headed for the kitchen, but somebody hollered out that they needed somebody to watch, apparently as a lookout. Lytle stood as lookout. Smith and Bowman left with a microwave and a TV. Lytle became concerned about what was taking Dixon so long and went back towards the bedrooms. As he was going back to the bedrooms he noticed a body on the floor in the doorway and turned to this guy (Jack) and asked "What did you do to this guy?" Jack told Lytle, "Don't worry about it because they had taken care of them."

Lytle then hollered to Dixon and told him "we got to get out of here; that they did something to this guy." Lytle left and Dixon followed a short time later carrying a colored TV. Dixon and Lytle then went to this guy's (Jack's) back yard next to the church but did not see either Jack or the other man (Cayson) who was in the Chambers' house with Jack. They then made stops at Dixon's house and Smith's house before Lytle went home.

On November 30, 1983, Detective Floyd Williams interviewed Lytle concerning Lytle's involvement in the crime. Lytle initially denied involvement in the crime but later confessed to his participation. At trial Lytle admitted that he had not told the entire truth to Detective Williams.

Lytle gave a videotape statement to Detective Ed Glynn on December 3, 1983. He subsequently recanted the videotaped statements and admitted at trial that he had not told the truth in that statement.

Lytle gave a statement on December 12, 1983, to Detective Harold Otum wherein his portrayal of the events conflicted with his earlier versions. He subsequently called Detective Otum and told Otum he had not told the truth. At trial Lytle admitted giving conflicting statements to the police.

Additionally, Anthony Addison testified at trial. Addison lived two doors down from the Chambers' residence. He testified that he was familiar with Michael Cunningham and had grown up with him. He stated that he knew Cunningham by the nickname "Blackjack."

Cunningham testified in his own behalf and denied involvement in the crime.

Cunningham argues that the evidence was insufficient to show that he committed a burglary or that the Chambers were killed in the perpetration thereof, thus insufficient to support the first degree murder convictions.

In determining whether there is sufficient evidence to sustain a conviction, a reviewing court must accept as true all evidence, direct and circumstantial, and all reasonable inferences which are most favorable to the state and disregard all evidence and inferences to the contrary. *State v. Gardner*, 741 S.W.2d 1, 9 (Mo. banc 1987) (citations omitted). Weighing the evidence to determine whether the defendant was guilty beyond a reasonable doubt is the role of the jury and not the function of this court. *State v. Simpson*, 718 S.W.2d 143, 146 (Mo.App.1986) (citations omitted). These principles apply whether the evidence is direct or circumstantial. *Id.*

Cunningham's argument is two-fold. Initially Cunningham challenges the evidence to support the burglary conviction. In this contention he alleges that there was insufficient evidence that he unlawfully entered and remained at the Chambers' residence. In particular, Cunningham points out that there were no tests done on the door of the Chambers' residence to see if the damage done on that door was a result of previous

damage; that there were no shoe print comparisons done of the shoe print on the door to determine if that print belonged to one of the Chambers or someone else; and that the State failed to prove that he did not have a privilege to enter the Chambers' residence. According to Cunningham, there was nothing other than the testimony of Lytle and his calls to the 911 emergency line to link him with the crime.

The testimony of Anthony Lytle, a co-participant in the crime was entitled to be believed by the jury and, if believed, as it obviously was, supported the burglary conviction. *State v. Keck*, 389 S.W.2d 816, 818 (Mo.1965). Lytle, although somewhat tenuous in his identification of Cunningham on prior occasions, positively identified Cunningham (a/k/a Jack) at trial as the person that he and Dixon saw coming out of the Chambers' home with a TV and as the person that they followed behind the church and watched hide the TV. Cunningham is also the person that Lytle testified agreed to let Lytle's group go back inside the Chambers' home with him after Dixon began a conversation with Cunningham.

Furthermore, the testimony of Officer Hughes, who was dispatched to the Chambers' residence on the morning of November 27, 1983, established that the home was in disarray and appeared to have been ransacked. It was also established at trial that items had been taken from the residence, including two TV's and a wallet I.D. Clearly, the evidence supported an inference that whoever entered the Chambers' residence was not privileged to do so and therefore was there unlawfully.

Secondly, Cunningham asserts that the State failed to show that he and his alleged accomplices caused the death of the Chambers during the perpetration of the burglary. This is so, according to Cunningham, because of the absence of the identity of the killer and the lack of evidence that the Chambers were killed as a "natural and proximate result of a burglary." Cunningham refers this court to the trial testimony of Dr. Peterson who performed the autopsies of the Chambers but could not pinpoint a time of death. Also, Cunningham refers

the court to the testimony of Lytle wherein Lytle said he saw the bodies lying on the floor in the Chambers' home and the ensuing conversation when Lytle asked "this other guy" (Jack) what had happened and the guy replied, "Don't worry about it they had taken care of them."

Cunningham maintains that because there was no determination as to the identity of "they" in the statement "they had taken care of them" the jury could have drawn the inference that it was someone other than himself that had "taken care" of the victims at some time prior to the underlying felony of burglary.

Contrary to Cunningham's contention, the jury was under no obligation to believe and draw the inference he proposes. A jury is permitted to draw from the evidence such reasonable inferences as the evidence will support. *State v. Moon*, 602 S.W.2d 828, 831 (Mo.App.1980). It was clear from the testimony of Lytle that the person he was speaking to was someone known only to him at that time as "Jack" but whom he subsequently identified as Cunningham. Further, the jury clearly and reasonably could have found that the "they" referred to by Lytle was a reference to Cunningham and Cayson—the other person who was identified as being with Cunningham in the Chambers' home. Because there was sufficient evidence to support Cunningham's first degree murder convictions, Point one is overruled.

In Point two, Cunningham contends plain error in the trial court's failure to sua sponte limit a portion of the State's closing argument. The complained of portion is as follows:

"The saddest part about this case is that we know for five minutes that Earl and Pauline Chambers—Earl Chambers, 86, had to watch as his wife was pushed, beaten, stabbed, cut and he couldn't help her. And he had to watch as she was beaten. They couldn't help each other. This team for 45 years had made it through all of the struggles that life had to offer them were not unable to help each other in this last struggle."

Because Cunningham failed to object to this argument at trial or in his Motion for New Trial, the issue is not preserved for review and can be reviewed only for plain error pursuant to Rule 29.12(b). Absent a showing of a manifest injustice or miscarriage of justice the judgment should be affirmed. *State v. Mayhue,* 653 S.W.2d 227, 237 (Mo.App.1983), Rule 30.20.

Dr. Bonita Peterson testified at trial that based on her opinion the Chambers were alive around five to ten minutes before they died of stab wounds. Therefore, it cannot be said that the argument was plainly unwarranted. *State v. Armbruster,* 641 S.W.2d 763, 766 (Mo.1982). Furthermore, in light of the ample evidence presented at trial to support Cunningham's conviction, it cannot be said that these comments had a decisive effect on the jury's determination or resulted in manifest injustice. *State v. Murphy,* 592 S.W.2d 727, 732–733 (Mo. banc 1979).

Based upon the foregoing, the decision of the trial court was proper in all respects and is affirmed.

All concur.