# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-2694

_____

Jon Keith Smith,                            *
                                            *
        Appellant,                       *
                                            *
                                            *   Appeal from the United States
    v.                                      *   District Court for the
                                            *   Western District of Missouri.
Michael Groose;                             *
Missouri Attorney General,                  *
                                            *
        Appellees.                       *

_____

Submitted:  May 13, 1999

Filed:  March 7, 2000

_____

Before WOLLMAN, Chief Judge, FLOYD R. GIBSON, and BEAM, Circuit Judges.

_____

WOLLMAN, Chief Judge.

Jon Keith Smith was convicted of first-degree felony murder,[1] armed criminal action, robbery, and burglary in Missouri state court and was sentenced to five terms

---

[1]The statute in effect was Missouri Revised Statutes section 565.003 (1978), which has since been repealed.  Felony murder is now a type of second-degree murder. See Mo. Rev. Stat. § 565.021 (West 1999).

of life imprisonment. He appeals from the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Although we do not lightly overturn this thirteen-year-old state conviction, we conclude that we are compelled to do so. We reverse and remand the case with directions to issue an appropriate writ because the State's use of inconsistent prosecutorial theories violated Smith's due process rights in a way that rendered his convictions fundamentally unfair.

## I.

On the morning of November 27, 1983, Police Officer James Hughes discovered the dead bodies of Pauline and Earl Chambers in their home in Kansas City, Missouri. A butcher knife found on a bed near the bodies was determined to be the murder weapon.

During the evening of November 26, 1983, Smith, James Bowman, Anthony Lytle, and Donald Dixon, all then juveniles, set out to find a house to burglarize. Testifying for the State at Smith's trial, held in March 1987, Lytle stated that the group began to knock on the front doors of neighborhood homes. If someone answered, the group asked if there was a party inside. At those houses where no one responded, the teenagers unscrewed the porch light bulbs, intending to return later to complete a burglary. When the group approached the Chamberses' house they noticed that the storm door had been broken and saw a footprint on the front door, which was ajar. Although Smith believed that the house belonged to an elderly white couple who were rarely home, Lytle observed a black man through the window. The group concluded that someone else was in the process of burglarizing the house and decided to "rob the burglars."

Smith and Bowman departed to obtain Bowman's car, which they had left down the street at Smith's house, while Lytle and Dixon watched the house from the bushes. The car contained Bowman's shotgun, which the group intended to use to threaten the

burglars. When an individual left the house carrying a television, Dixon recognized him as Michael Cunningham. Dixon spoke with Cunningham, who agreed to allow the Dixon-Lytle group to enter the house and steal what remained of the property. When Smith and Bowman returned in the car, Dixon explained that they now had "permission" to enter the house, and the four entered with Cunningham.

Lytle stood guard at the front door while Smith, Bowman, and Dixon searched the house for property worthy of theft. Smith ran to the kitchen, saying "oh, oh, a microwave!" and Bowman to an empty front bedroom. Shortly thereafter, Smith and Bowman left the house together, Smith carrying a microwave and Bowman carrying a television. From this point, Lytle's accounts of the incident vary.

According to Lytle's testimony at trial, after Smith and Bowman departed Lytle ran to the back of the house to find Dixon. On the way, Lytle saw a body lying in a doorway and asked Cunningham, "What did you do to this guy?" Cunningham responded, "Don't worry about it. We took care of it." Lytle then "started hollering about 'We got to go now because he did something to this guy,'" to Dixon, who grabbed a television and then fled the scene with Lytle, joining Smith and Bowman and driving away from the premises. This version of the events is consistent with a statement Lytle made to police on November 30, 1983.

On December 2, 1983, however, Lytle told police a different version of the events, one which he later recanted. Lytle stated that his group was inside the house before the Chamberses were murdered. He said that he heard the Chamberses talking to one of the burglars and that a scuffle ensued. He heard Mr. Chambers say "no, no, no" and then heard "sounds of pain." Lytle said that he went to see what was happening and observed Bowman, who had returned to the house, kneeling over Mr. Chambers and stabbing him with a pocket knife. He said that Bowman had blood "all over his jacket." Cunningham and another adult, identified as Rodney Cayson, were also in the back bedroom.

At Smith's trial, the State used Lytle's December 2, 1983, statement to impeach his in-court testimony and as substantive evidence of Smith's guilt by relying upon section 491.074 of the Missouri Revised Statutes, which was enacted after the Chamberses had been killed and which authorizes the use of prior inconsistent statements as substantive evidence. See State v. Bowman, 741 S.W.2d 10, 12-13 (Mo. 1987) (en banc). The State accordingly argued that Bowman was the killer and that Smith was therefore guilty of felony murder, armed criminal action, and robbery because the murder occurred while he was in the house committing the burglary.[2] The jury agreed and convicted Smith of two counts of first-degree felony murder, two counts of armed criminal action, one count of first-degree robbery, and one count of second-degree burglary. The court sentenced Smith to five life sentences, four to run concurrently, one consecutively. The jury's recommendation of a seven-year sentence for the burglary offense was not imposed because the court found that it would constitute double jeopardy to sentence Smith on that conviction.

In April of 1987, after Smith's trial and conviction, the State indicted Cunningham for the murders. At Cunningham's trial, the State relied on testimony from Lytle, consistent with his November 30, 1983, statement and his testimony at Smith's trial, that the Chamberses were already dead when he and his companions

---

[2]The State also relied on Lytle's statement incriminating Bowman to convict Bowman of one count each of first-degree felony murder, armed criminal action, stealing without consent, and second-degree burglary. See State v. Bowman, 741 S.W.2d 10, 11 (Mo. 1987) (en banc). Bowman was acquitted on one felony murder charge. See id. at 12. We affirmed the district court's denial of Bowman's claim for habeas relief. See Bowman v. Gammon, 85 F.3d 1339 (8th Cir. 1996).

Dixon was convicted of similar charges at approximately the same time as Lytle, before the effective date of section 491.074. Lytle's statements, however, were not used as evidence at his trial; Dixon incriminated himself in a letter asking Lytle to say that he had worn the shoes that made a shoeprint at the residence. See State v. Dixon, 716 S.W.2d 815 (Mo. Ct. App. 1986).

arrived. The December 2, 1983, statement was mentioned but not admitted. The jury convicted Cunningham of two counts of first-degree murder, two counts of armed criminal action, one count of first-degree robbery, and one count of second-degree burglary. His convictions were affirmed in State v. Cunningham, 763 S.W.2d 186 (Mo. Ct. App. 1988).

Smith's appeal from his conviction included a claim challenging the sufficiency of the evidence based on Lytle's recanted statement. The Missouri Court of Appeals affirmed Smith's convictions and sentence in an unpublished opinion on May 3, 1988. An application to transfer to the Missouri Supreme Court was denied on September 13, 1988. Smith filed a federal habeas petition in June 1991, again including a claim about the insufficiency of the evidence based on Lytle's statement. The federal district court denied both the petition and Smith's application for a certificate of probable cause. It denied the sufficiency of the evidence claim on the merits. On January 29, 1993, we remanded the case for further proceedings based on a claim of newly discovered evidence. On August 4, 1995, the district court again denied the petition, and on November 16, 1998, we granted Smith a certificate of appealability on his claim of insufficient evidence regarding the following question: "Does the fact that the State secured Appellant's murder conviction on the basis of testimony from Anthony Lytle that was inconsistent with, if not diametrically opposed to, the testimony that Lytle subsequently gave at Michael Cunningham's trial . . . render Appellant's murder conviction void for want of due process?"

We answer the question in the affirmative.

## II.

Because Smith's petition for habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996) (AEDPA), we apply the pre-AEDPA standard of

review to his claim. See Lindh v. Murphy, 521 U.S. 320, 336-37 (1997); Pruett v. Norris, 153 F.3d 579, 584 n.6 (8th Cir. 1998). Federal habeas review of an alleged due process violation stemming from a state court conviction is narrow. See Darden v. Wainwright, 477 U.S. 168, 181-83 (1986); Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995). To obtain habeas relief on a due process claim, the petitioner must show that the impropriety was so egregious that it "fatally infected the proceedings and rendered [the] entire trial fundamentally unfair." Young v. Bowersox, 161 F.3d 1159, 1161 (8th Cir. 1998) (quoting Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir.1985)). Under this standard, the petitioner must demonstrate a "reasonable probability that the error complained of affected the outcome of the trial," meaning that the verdict probably would have been different absent the alleged impropriety. Hamilton v. Nix, 809 F.2d 463, 470 (8th Cir. 1987) (en banc).

## III.
## A.

The question before us is whether the Due Process Clause forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event.

We begin with the government's fundamental interest in criminal prosecution: "not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935); see United States v. Agurs, 427 U.S. 97, 111 (1976). Although the prosecutor must prosecute with earnestness and vigor and "may strike hard blows, he is not at liberty to strike foul ones." See id. The government's role therefore is unique in the justice system, and with it come certain mandates as well as privileges. Consistent with this "quasi-judicial" role, see, e.g., State v. Ross, 829 S.W.2d 948, 951 (Mo. 1992) (en banc), the Due Process Clause requires conduct of a prosecutor that it does not require of other participants in the criminal justice system, such as the duty to "disclose evidence favorable to the accused that, if suppressed,

-6-

would deprive the defendant of a fair trial . . . ." United States v. Bagley, 473 U.S. 667, 675 (1985). The due process requirement will cast into doubt a conviction obtained by a prosecutor's knowing or reckless use of false testimony. Napue v. Illinois, 360 U.S. 264, 269, 272 (1959); United States v. Duke, 50 F.3d 571, 577-78 & n.4 (8th Cir. 1995) (government has duty to serve and facilitate the truth-finding function of the courts). On the other hand, the government also benefits from its peculiar position. For example, the government is permitted to offer leniency to witnesses in return for testimony. See United States v. Hunt, 171 F.3d 1192, 1195 (8th Cir. 1999).

Two courts of appeals have recognized that inconsistent prosecutorial theories can, in certain circumstances, violate due process rights. In Thompson v. Calderon, a plurality of the Ninth Circuit held that the state of California violated a defendant's due process rights by arguing at Thompson's trial that he alone committed a murder, while arguing at a subsequent trial that another defendant actually committed the same murder. 120 F.3d 1045, 1058-59 (9th Cir. 1997) (en banc), vacated on other grounds, 523 U.S. 538 (1998). After noting the fundamental duty of prosecutors "to vindicate the truth and to administer justice," the court pointed out that the prosecutor in the second trial "returned to his original theory and discredited the very evidence he had previously offered in Thompson's trial." Id. The prosecutor had argued different motives, different theories, and different facts for each defendant and had secured convictions at both trials. Id. at 1059.

In Drake v. Francis, the Eleventh Circuit evaluated two prosecution arguments for two defendants convicted of the same murder. The court found that the two theories were "fairly consistent" because both prosecutors had argued that both defendants played a role in the murder; because their arguments varied only with regard to the extent of involvement, no due process violation had occurred. 727 F.2d 990, 994 (11th Cir. 1984). On rehearing en banc, the majority declined to reach the issue, granting relief on other grounds. Drake v. Kemp, 762 F.2d 1449, 1451, 1461 (11th Cir.

1985) (en banc). In his special concurrence, Judge Clark addressed the due process issue. After exhaustively recounting the evidence regarding what he concluded were totally inconsistent theories of the same crime, he concluded that "[t]he state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth." Id. at 1479 (Clark, J., specially concurring).

The Fifth Circuit has also discussed the problem of seemingly inconsistent prosecutorial arguments for different defendants at different trials, but in the context of estoppel, both collateral and judicial. See Nichols v. Scott, 69 F.3d 1255, 1268-72 (5th Cir. 1995). The court found that a guilty plea by one co-defendant did not estop the government from seeking a murder conviction through trial of the other, particularly given that the evidence showed that both men were present and had participated in the robbery and the shooting at the victim, thus rendering both liable to a conviction of felony murder, even though it could not be determined whose gun caused the fatal wound. See id. at 1270-71. The court found that the arguments were not factually inconsistent. See id. at 1269.

In the present case, the prosecutor who handled Smith's case also handled Cunningham's and, we note, the cases against all the other defendants. When trying Smith, the State asserted that Lytle's December 2, 1983, statement was the truth, that Lytle had made up his in-court testimony to try to avoid his and his associates' convictions for felony murder, and that Bowman had killed the Chamberses after Smith's group entered the house. See, e.g., Tr. on Appeal, Vol. II at 597 ([Prosecutor:] "So that's why the Chambers were killed. Mentality of Bowman: avoid detection."). Subsequently, when trying Cunningham, the State contended that Lytle's November 30, 1983, statement was the truth, did not introduce the videotaped December 2, 1983, statement, and objected to a line of questioning by defense counsel based on the theory that Lytle was lying about Cunningham's complicity in order to protect his friends.

In short, what the State claimed to be true in Smith's case it rejected in Cunningham's case, and vice versa. The State points out in its brief that "[t]here is no question that the victims were killed during the burglary either before or after the petitioner began to participate." This is precisely the point--the State argued in one case, "before," and in another case, "after," in its successful attempt to prove beyond a reasonable doubt that the Chamberses were murdered at two different times. The state court formulated jury instructions that attempted to account for this difference in timing and the conclusions which flow from it. See Legal File, jury instr. 7.[3] This before/after distinction is the heart of the prosecutorial inconsistency that allowed the State to convict as many defendants as possible in a series of cases in which the question of timing was crucial. See State v. Bowman, 741 S.W.2d 10, 12 (Mo. 1987) (en banc) (Lytle's December 2, 1983, statement may "provide the only firm indication" the Chamberses were assaulted after Lytle's group arrived). In contrast to the situation in Nichols, the State's argument here is not factually consistent, nor could Smith have been convicted of felony murder under both theories. We note that the State's prosecutor's office itself recognized the importance of the timing to the juveniles' convictions for the murders when it consented to the vacation of Lytle's convictions in a time-barred state post-conviction motion hearing that resulted in Lytle's release. See Tr. 29.15 Mot., Lytle v. State, at 9 (January 11, 1990) (State stipulated that Lytle's counsel was ineffective for failing to object to jury instructions because "according to Anthony Lytle's testimony, the people were dead, and yet according to the argument used by [the prosecutor] under the cases, it doesn't matter.").

---

[3]The jury, however, may have remained somewhat confused by the instructions. See Tr. on Appeal, Vol. II at 639-40 (court requiring that jury re-read instructions and redetermine verdicts because of first erroneous verdicts). Indeed, despite the conscientious efforts of the attorneys and the court, jury instructions 6 and 7 are contradictory on this crucial aspect of timing, making it difficult to conclusively determine what the jury found regarding Smith's guilt. On this point, however, we defer to the Missouri courts' interpretation of the instructions, as described in Part B.

A similar but more common situation is that in which a prosecution witness proffers testimony that is inconsistent with his previous testimony elsewhere. In United States v. Albanese the defendant claimed that the prosecutor's reliance on one witness's inconsistent testimony constituted misconduct that resulted in a hung jury, thereby precluding any additional prosecution under the Double Jeopardy Clause. 195 F.3d 389, 390 (8th Cir. 1999). In affirming the district court, we held that the prosecutor's seemingly inadvertent use of inconsistent testimony, particularly when coupled with the reopening of the witness's cross-examination, did not rise to the level of misconduct that would bar a retrial. See id. at 393-94. In Smith's case, in contrast, we need not speculate on jury deliberations or prosecutorial intent, or discuss whether Lytle's inconsistent statements should have been presented to the jury. Here, the witness did not change his story at trial. Rather, the prosecutor chose at Smith's trial to use Lytle's December 2, 1983, statement to secure Smith's conviction and then later, at Cunningham's trial, elected to use Lytle's November 30, 1983, statement to secure Cunningham's conviction. Lytle's testimony constituted the only evidence of when the murders occurred and was the sole basis for two different convictions on two contradictory theories. In Albanese, in contrast, identity was established, and the inconsistency related solely to the defendant's level of involvement in a conspiracy to rob and murder a drug dealer. See id. at 391. During Albanese's trials, the inconsistency in the testimony was presented to the jury, id. at 394; in Smith's trial, no such inconsistency could be shown because Cunningham's trial had not yet occurred.

Smith contends that this manipulation of the evidence deprived him of due process and rendered his trial fundamentally unfair. We agree. The State's use of factually contradictory theories in this case constituted "foul blows," error that fatally infected Smith's conviction. Even if our adversary system is "in many ways, a gamble," Payne v. United States, 78 F.3d 343, 345 (8th Cir. 1996), that system is poorly served when a prosecutor, the state's own instrument of justice, stacks the deck in his favor. The State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth.

Suppose, for example, that the prosecutor had argued a murder theory based on Lytle's December 2, 1983, statement to convict Smith in Courtroom A in the morning, then walked upstairs to Courtroom B and argued a contradictory murder theory based on Lytle's November 30, 1983, statement to convict Cunningham in the afternoon? Again, suppose that Smith and Cunningham had been tried jointly. Would the prosecutor have been entitled to ask the jury to accept as true both of Lytle's accounts of who had murdered the Chamberses in an attempt to secure convictions of both Smith and Cunningham?

We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principles of due process. For example, the passage of time between trials, such as the four months' time between Smith's trial and Cunningham's, may be a legitimate excuse for minor variations in testimony or defects in memory, as seems to have occurred in Albanese. See 195 F.3d at 393. In Smith's case, however, the relevant variation was neither minor nor found in the testimony at trial.

Smith's situation is unusual, and we doubt that claims such as his will often occur. To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime. In the present case, the State's zeal to obtain multiple murder convictions on diametrically opposed testimony renders Smith's convictions infirm. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." See Brady v. Maryland, 373 U.S. 83, 87 (1963).

## B.

To obtain habeas relief under the Due Process Clause, Smith must demonstrate that the State's error rendered unreliable his convictions involving the violence done to the Chamberses. We find that Smith has succeeded in doing so. We note that Smith has not contested the burglary conviction. Moreover, we do not find the burglary conviction to be undermined, given that the inconsistency centers on the charges arising from the Chamberses' deaths, not on the charge for Smith's theft of property from the home.

In its unpublished memorandum decision affirming Smith's conviction, the Missouri Court of Appeals discussed with approval the jury instruction given at Smith's trial, stating that if the jury found that Cunningham or Cayson killed the Chamberses, the "jury would have to find appellant [Smith] not guilty." Thus, the jury would have had to find that someone other than Cunningham or Cayson was the murderer in order to convict Smith.

Absent the State's argument that Lytle's December 2, 1983, statement incriminating Bowman was the truth,--i.e. had the State presented Lytle's testimony as it did during Cunningham's trial--the State had no evidence to prove that Bowman was the killer and that Smith was thus guilty of felony murder, armed criminal action, and first-degree robbery. Bowman's shoes did not match the bloody footprints in the room. Bowman's prints were not found on the butcher knife determined to be the murder weapon. No blood was found on Bowman's clothes. Aside from Lytle's testimony, the State's strongest evidence against Smith consisted of a palm print on a stolen television found at his residence and a shoeprint from the residence which matched that of Donald Dixon's shoes. The State presented evidence that the Chamberses were murdered, but on the key question of the time at which the murders were committed, the State's evidence--Lytle's testimony--was offered to prove two different versions, which the State then used in different, inconsistent ways during the trials.

-12-

Therefore, absent the State's actions, the outcome of the trial probably would have been different; Smith likely would not have been convicted of murder, armed criminal action, and robbery. As the State asserts, either Smith arrived before the murder or he arrived after; once the State's use of inherently contradictory theories is removed, the remaining evidence submitted during his trial points to "after." Accordingly, Smith's convictions for murder, armed criminal action, and robbery must be vacated.

The State argues that Smith could have been convicted for felony murder under the theory the prosecution put forth at Cunningham's trial.[4] This assertion is misdirected. The State proved its case against Smith under the Bowman-as-murderer theory, and speculation regarding what the jury might have done under different circumstances is not a basis upon which to dispense with the State's due process duty of fair prosecution. Our analysis involves the fairness and outcome of the trial at issue, Smith's trial. Assuming, arguendo, however, that the State's argument is relevant, given the evidence in the case we find it unlikely that a jury would have convicted

---

[4]We briefly address the State's arguments concerning our decision in a companion case, Bowman v. Gammon, 85 F.3d 1339 (8th Cir. 1996). The State points out that we denied habeas relief to Bowman and noted that a jury could have believed Lytle's December 2, 1983, confession, which was admitted during Bowman's trial much as it was in Smith's. See id. at 1346. In Bowman's case, however, we were presented with a procedurally barred claim requiring Bowman to meet the actual innocence standard, which subjects a petitioner to a heavier burden of proof than does Smith's preserved due process claim. See id. (discussing actual innocence standard; second prong requires petitioner show "more likely than not no reasonable juror would have convicted him"). That Bowman did not conclusively show he was actually innocent--that he was not present at the time of the murders--does not mean that Smith cannot succeed on a preserved claim of constitutional error that undermines our confidence in the outcome. Morever, in Bowman's case we were not presented with the issue of the State's use of diametrically opposed theories of guilt.

Smith under the State's theory presented at Cunningham's trial, which established through Lytle's in-court testimony that Cunningham and Cayson were responsible for the Chamberses' deaths before Cunningham re-entered the house with Lytle, Smith, Bowman, and Dixon, and that Cunningham then told Lytle not to worry because they had "taken care of" the Chamberses. The State itself had originally dismissed the charges against Smith for insufficient evidence for the crimes of violence. See Dep. of Prosecutor at 3-4. We conclude that it is unlikely that the jury could have found beyond a reasonable doubt that Smith was guilty of felony murder if it had been presented with the State's Cunningham-trial theory that the Chamberses had been killed prior to the entry into the home by Smith and his cohorts.

## IV.

The State argues that a holding that the State's use of factually contradictory theories violates due process constitutes a new rule of law that may not be applied retroactively to Smith under Teague v. Lane, 489 U.S. 288 (1989). "The non-retroactivity principle [in Teague] prevents a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final." Caspari v. Bohlen, 510 U.S. 383, 389 (1994) (emphasis in original). Under Teague, a new rule is one that is not dictated by precedent and, if adopted, would contravene well established precedents. See Saffle v. Parks, 494 U.S. 484, 486 (1990).

Our holding in this case is a decision dictated by precedent, for we do not break new ground nor impose a new obligation on the government. Neither the due process requirement that the government prosecute fairly in a search for truth nor the prosecutor's role in such a prosecution constitutes a new rule of law. The prosecutor "is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." Berger, 295 U.S. at 88. "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce

a wrongful conviction as it is to use every legitimate means to bring about a just one." See id. The prosecutor's role is to protect those innocent of crimes and to uphold the constitutional rights of the accused--to seek justice and fairness, not solely convictions. See id.; Bagley, 472 U.S. at 667. Those lawyers who act on behalf of the government in criminal cases "serve truth and justice first." Thompson, 120 F.3d at 1058 (discussing due process case law, ethics rules, and the prosecutor's role). State courts, presented with a factual contradiction in successive prosecutions as occurred in this case, would have been compelled to hold as we have.

Even if our holding were to constitute a new rule of law, however, it would fall within the narrow Teague exception for cases that establish rules necessary to fundamental standards of fairness and accuracy in the criminal law. See Teague, 489 U.S. at 312; Parks, 494 U.S. at 495; see also Butler v. McKellar, 494 U.S. 407, 416 (1990) (holding Teague's fundamental fairness exception inapplicable to a rule that does not promote the accuracy of convictions). Our holding that the Due Process Clause's guarantee of fundamental fairness prohibits prosecutors from putting forth inherently factually contradictory theories to convict multiple defendants of the same murder embodies the elements of primacy and centrality that indicate a "watershed rule of criminal procedure." Parks, 494 U.S. at 495. "That requirement [of due process in a criminal trial], in safeguarding the liberty of the citizen against deprivation through the action of the state, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions." Mooney v. Holohan, 294 U.S. 103, 112 (1935).

## V.

The judgment is reversed, and the case is remanded to the district court with directions to issue an appropriate writ of habeas corpus vacating Smith's murder, armed criminal action, and robbery convictions. We have a duty to "dispose of the case summarily, as law and justice require." See 28 U.S.C. § 2243 (1999); Peyton v. Rowe,

391 U.S. 54, 66 (1968). Although we have the "authority to preclude a state from retrying a successful habeas petitioner," that retrial bar is an "extraordinary remedy" suitable only in certain circumstances. See Foster v. Lockhart, 9 F.3d 722, 727 (8th Cir. 1993). Because the evidence and the theory of guilt advanced at his trial may have been sufficient to convict Smith, under Lockhart v. Nelson the State is entitled to retry him. See 488 U.S. 33, 40, 42 (1988). We thus direct the district court to enter an order granting Smith release from custody unless within a reasonable time the State affords him a retrial on the vacated charges, at which the State will be precluded from relying upon Lytle's December 2, 1983, statement as evidence of Smith's guilt.

We express our appreciation to appointed counsel for her zealous efforts on Smith's behalf.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.