IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2003 Session

## STATE OF TENNESSEE v. GENE SHELTON RUCKER, JR.

**Appeal from the Criminal Court for Hamilton County**
**No. 235483     Douglas A. Meyer, Judge**

––––––––––––––

**No. E2002-02101-CCA-R3-CD - Filed December 9, 2004**

––––––––––––––

A Hamilton County Grand Jury indicted the defendant, Gene Shelton Rucker, Jr., for felony murder and aggravated arson in connection with a fire that took the life of an individual who resided in the apartment structure that was burned.  Following a jury trial, the defendant was convicted of the lesser-included offense of criminally negligent homicide and aggravated arson, as charged.  The defendant now appeals his convictions and sentence.  Specifically, the defendant argues (1) that the trial court erred by instructing the jury on criminal responsibility for the conduct of another; (2) that setting fire to personal property is a lesser-included offense of aggravated arson and should have been included in the charge to the jury; (3) that the instruction on the knowing *mens rea* element of aggravated arson was incorrect; (4) that the state violated the defendant's due process rights by advancing impermissibly inconsistent positions relative to the defendant and an indicted co-defendant; (5) that the evidence was insufficient to support his convictions; and (6) that his sentence should not have been enhanced on the basis of prior convictions that were not proven by certified copies of the underlying judgments.  After a thorough review of the record, we affirm the defendant's convictions and sentence.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Melanie R. Snipes, Chattanooga, Tennessee, for the Appellant, Gene Shelton Rucker, Jr.

Paul G. Summers, Attorney General & Reporter; Braden H. Boucek, Assistant Attorney General; William H. Cox, III, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

In the evening hours of November 2, 2000, a fire erupted in an old building located at 332½ Martin Luther King Boulevard in Chattanooga. Rose's Lounge, a drinking establishment, and another business occupied the first floor of the building, and approximately ten boarding-room type apartments were situated on the second floor. It is undisputed that the fire originated on the upper level in apartment number 3. It is also undisputed that Beverly Young, who lived in apartment number 8, sustained inhalation injuries and thermal burns to approximately 60 to 70 percent of her body; she survived three days in the hospital before she succumbed to the lethal injuries.

The defendant and Jillena Orr, who were residing together in apartment number 3, were charged with the felony murder of Ms. Young and aggravated arson of the building at 332½ Martin Luther King Boulevard. Trial for the defendant began on October 30, 2001, while Orr's case was set for trial in December 2001.

Despite her pending charges, Orr voluntarily appeared and testified for the state at the defendant's trial that she and the defendant had been cohabiting in apartment number 3 for almost two months. She kept clothing and other personal items in the apartment. Orr was not employed at the time, whereas the defendant was gainfully employed and paying the rent for the apartment.

November 2 was a regular work day for the defendant. Orr testified that he left that morning to go to work at ConAgra and did not return until after working hours. Orr was not in the apartment when the defendant returned; instead, she was downstairs in Rose's Lounge socializing and drinking with her friend, Tonya Davis, Davis' boyfriend, and another man. Orr admitted that she was very intoxicated, having consumed vodka, beer, and Fighting Cock. When the defendant found Orr in the lounge, he was, in Orr's words, "upset with me because I was sitting with dude." Although Orr was a drug user, she insisted at trial that she had not taken any drugs that day.

The defendant came in and out of the lounge several times urging Orr to go upstairs to their apartment. Orr testified that she eventually went to the apartment after deciding that she would get her clothes and leave. The defendant followed her into the apartment, and the two argued loudly. Orr said that she gathered her clothes to leave, but the defendant would not permit her to leave the apartment; he physically blocked the doorway. Orr testified that she pulled a pocket knife from her pocket and cut the defendant. When the defendant did not move out of her way, she picked up a pair of scissors to cut him. Orr explained that the defendant was upset because she was trying to leave, and they were yelling at each other.

According to Orr, she got tired of arguing, so she walked to the bed and sat down intending to sleep. When the defendant tried to talk to her, Orr said that she told him that she was going to leave anyway as soon as he went to sleep. That remark prompted the defendant to threaten to burn her clothes if she tried to leave, whereupon the defendant picked up some paper and set it on fire. Orr testified that she got up and tried to run out of the door. The defendant, however, tossed the burning paper, got in front of her, and blocked her at the door. Orr related that she began

shouting for the defendant to let her leave, and then she smelled smoke. Orr turned around and saw fire behind her. She asked the defendant to let her leave, and that time he said that they would "just die together." The smoke intensified, and Orr said she could not breathe. At that point, she physically shoved the defendant out the way and ran down the stairs.

Orr recalled that she ran into the lounge, where she encountered the manager and another man. She told them that the defendant had tried to kill her. The men ran up the stairway to investigate. What Orr did next is somewhat unclear. She testified about telling people in the lounge about the fire, being in the lounge after everyone ran out, running from the defendant when he came into the lounge, running up the street to another club to get away from the defendant, and eventually returning to the site of the fire, where she learned that Young had been injured in the fire.

Orr admitted at trial that she had two prior theft convictions and had been convicted of prostitution. Orr related that her attorney had advised her that she was not required to testify because charges were pending against her. When asked if she was hoping for anything as a result of her testimony, Orr answered, "I'm hoping for all this to be over." Additionally, she added that she was testifying because she wanted to tell the truth. Evidently, Orr also had testified for the state at the defendant's preliminary hearing. At the time of her preliminary hearing testimony, the initial arrest warrants against her had been dismissed; afterwards, however, the grand jury returned an indictment jointly charging the defendant and her with felony murder and aggravated arson.

On cross-examination, the defense pointed out inconsistences between Orr's trial testimony and statements she had given to the police and the fire department at the investigatory stage. For instance, Orr told the police and fire department that the lighted paper landed in the closet. At trial, she recanted and insisted, "I don't know where the paper went. I was sitting on the bed. As I tried to run out the door, he tossed the paper to get to the door before I got there." Orr denied that she set the fire so she could get out of the apartment.

Kirby Marshall managed Rose's Lounge and the upstairs boarding rooms for the property owner, Carolyn Jenkins. He collected rent and kept the property clean. Marshall testified at trial that he lived in the apartment next door to the defendant and Orr. Marshall was downstairs when the fire started. He recalled seeing Orr come down the stairs; he did not know her personally but knew who she was. Marshall stated that Orr was making comments about "that fool crazy" and "set my clothes afire." As Orr passed by Marshall to walk inside the lounge, Marshall heard Orr say, in a joking tone, "That fool said he was going to set my clothes on fire." Marshall testified that Orr never asked him to call the police.

Marshall did not investigate at the time. He testified that approximately ten minutes later the defendant came down the stairs and advised that there was "a little fire upstairs." Marshall did not take the comment seriously, but when he later checked, he discovered a big fire.

Ronald Asberry, who had previously been convicted of aggravated assault and multiple counts of passing worthless checks, was living in apartment number 4 at the time of the fire.

Asberry knew the defendant and Orr, and Asberry's apartment was directly across the hall from their apartment. Asberry testified that he was home that evening and heard fighting and arguing emanating from the defendant's and Orr's apartment. Although he tried to ignore the noise, the apartment walls were very thin, and at some point he opened his apartment door and looked outside. Asberry recalled that he saw Orr heading down the steps, yelling and talking about the defendant getting ready to set fire to the place. The door to the defendant's apartment was open, and Asberry could see inside the apartment. He described seeing the defendant "standing there with a lighter in his hand, and the clothes, they were beginning to burn, and he was just standing there and then he looked at me and then he walked out the room and went down the steps." Asberry said that he saw flames in the room.

Asberry testified he shut his apartment door. The smoke from the fire then began to roll under his door, at which point he decided to leave. A female companion was asleep in his room, and Asberry roused her. The two were going down the stairs when Asberry heard a commotion in the hallway. He stated that he looked back up the stairs and could see that Ms. Young was on fire. He saw Ms. Young collapse, and fire rained down on her.

On cross-examination, Asberry said that the reason he opened his apartment door was because he saw smoke coming under the door. In terms of the location of the fire, Asberry testified that he saw the fire on the wall in front of the defendant. Asberry expressed certainty that he did not see a fire near the closet in the apartment, nor did he see fire on the bed. He described the fire as burning from the bottom of some clothing that was hanging on the wall. Asberry admitted on cross-examination that he did not see the defendant light the fire but that the defendant was standing in the room as the fire was burning.

Lieutenant Reginald Clark with the Chattanooga Fire Department investigated the fire in this case. He determined that the fire originated in apartment number 3. Lieutenant Clark explained that typically when a fire starts it travels up and out in the shape of a "V." The heaviest area of charring at the fire scene is at the base of the "V," which indicates the "seat" of the fire. In this case, Lieutenant Clark testified that there was an obvious "V" pattern going up the north wall, near the bed area. The mattress and box springs were completely burned. Another heavy area of charring that could have been a second point of origin was on the south side of the room near a refrigerator and the doorway to the apartment. None of the samples that Lieutenant Clark collected and sent for testing were positive for any kind of accelerant.

Three witnesses testified for the defendant. The first witness, Reuben Sandridge, was at the building when the fire started. He was talking with Donald Underwood, who shared an apartment with the victim. Sandridge and Underwood were sitting in the hallway because the victim was asleep inside the apartment. Sandridge testified that he heard arguing around the corner and then smelled smoke. When the smoke became thick, Sandridge looked around the corner and saw the defendant and Orr running down the stairs. Underwood pushed open the defendant's apartment door, and fire leaped out into the hallway. Underwood shouted for Sandridge to wake up the victim and get her out of the apartment. While in the hallway, Sandridge and the victim became separated. Sandridge made it down the stairs alone. When he retraced his steps, he saw the victim sitting at the

top of the stairs. Sandridge grabbed and pulled the victim down the stairs on top of him. She was already badly burned. Sandridge testified that he did not see Asberry in the hallway.

Chattanooga Police Detective Tetzil Tillery testified for the defense that he was dispatched to assist with the suspected arson investigation. By the time he arrived at the scene, the defendant was in police custody, and approximately 50 to 75 people were outside watching the fire. Lieutenant Tillery interviewed three people that night: the defendant, Orr, and Sandridge. Based on the interviews, Lieutenant Tillery took both Orr and the defendant into custody. He testified that he arrested both individuals based on their conflicting accounts of what occurred and the uncertainty concerning which one actually started the fire.

The final defense witness scheduled to testify was Donald Underwood. Underwood, however, could not be located. Rather than continue the trial until Underwood could be found, the parties agreed that Underwood's preliminary hearing testimony could be read to the jury and that the jury could be advised that Underwood had been convicted in 1998 for aggravated assault.

Underwood's prior testimony was as follows. He heard arguing between the defendant and Orr. Underwood was talking with Sandridge in the hallway when they looked up and saw smoke rolling across the hall. Underwood walked in the direction of the smoke and encountered the defendant and Orr running towards the stairway. Underwood said that he opened the defendant's apartment door, and the fire was blazing. Underwood ducked and called out for someone to find the manager. Underwood testified that he then ran to his apartment to retrieve Ms. Young. Underwood did not recall seeing Asberry until everyone was downstairs.

Based on the evidence, the trial court instructed the jury on felony murder and the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The trial court also instructed on the charged offense of aggravated arson and the lesser-included offenses of arson and reckless burning. Over defense objection, the trial court gave an instruction on criminal responsibility.

The jury deliberated and found the defendant guilty of criminally negligent homicide and aggravated arson. At a separate hearing, the trial court sentenced the defendant, as a Range I offender, to two years on the criminally negligent homicide conviction and to 22 years for the aggravated arson, and it ordered the sentences to be served concurrently.

Aggrieved by his convictions and sentence, the defendant has appealed. He presents six issues for our consideration involving claims of jury instructional error, prosecutorial misconduct, evidence insufficiency, and sentencing enhancement.[1]

## I. JURY INSTRUCTIONS

---

[1] One additional issue, involving another claim of prosecutorial misconduct and designated as Issue V in the defendant's appellate brief, was abandoned by defense counsel at oral argument and need not be considered.

The first three issues that the defendant raises on appeal relate to the jury instructions given in this case.

## A. Criminal Responsibility

A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2003). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . , based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)

The trial court in this case gave a criminal responsibility charge over the defendant's objection. The objection, thereafter, was renewed and rejected by the trial court in denying the defendant's motion for new trial. On appeal, the defendant insists that this case was "about an alternative perpetrator" because "[e]ither the [defendant] or [Orr] set the fire that killed the victim." He argues that there was no evidence of some middle-ground guilt whereby he was complicit with Orr in a course of conduct in which Orr started the fire that ultimately took Beverly Young's life. Accordingly, he claims it was error to instruct the jury that it could convict him under a criminal responsibility theory.

We are not convinced that the jury was required to take an all-or-nothing approach to the charged offenses. It is the jury's province, as the trier of fact, to determine which parts of the testimony and evidence to credit, and there is no requirement that a jury must wholly accept or reject a witness's account of events. *See State v. Bolin*, 922 S.W.2d 870, 876 (Tenn. 1996). A charge of criminal responsibility is appropriate if it is fairly raised by the evidence. *See State v. Townes*, 56 S.W.3d 30, 36 (Tenn. Crim. App. 2000) (duty to charge when issue fairly raised by the evidence), *overruled in part on other grounds by State v. Reginald D. Terry*, __ S.W.3d __, No. W2001-03027-SC-R11-CD (Tenn., Jackson, Oct. 30, 2003). In this case, the issue whether the defendant was criminally responsible was, in our opinion, fairly raised by the proof.

It is often difficult, as this case illustrates, to persuasively advance a theory of defense if the accused does not testify. In this case, the defense attempted to counter the state's case through cross-examination of Orr. Orr testified that the defendant started the fire, and her testimony was largely corroborated by Asberry. On cross-examination, the defense emphasized that Orr was under indictment for the same offenses for which the defendant was being tried. The defense also attempted to get Orr to admit that she had started the fire to force the defendant to let her out of the room. In closing arguments, the defense then specifically advanced the theory that Orr was motivated to get away from the defendant any way possible, and starting a fire opened a route of escape for her.

The credibility of many of the witnesses in this case, including Orr, was suspect. Orr admitted that she was highly intoxicated the evening of the fire, and the jury easily could have

concluded that others present that evening were under the influence of alcohol or narcotics. Witnesses Orr, Asberry, and Underwood had multiple prior convictions. The physical evidence left by the fire was not totally consistent with either Orr's or Asberry's account of events. By her own testimony, Orr was out of control at times, screaming and stabbing the defendant with a pocket knife and scissors. Orr insisted that the defendant had physically blocked her exit from the room, yet she also admitted that she was taller and weighed more than the defendant.

From the testimony and mixed evidence, the jury reasonably could have concluded that the defendant started the fire, that Orr wielded the lighter, or that both were involved in the conflagration. As the state submits in its brief, a reasonable jury could have deduced that Orr lit a fire to get out of the room and that the defendant set her clothes on fire out of spite such that he acted with the requisite intent and aided Orr in the arson.

Accordingly, we believe that the issue of criminal responsibility was fairly raised in this case, and as a result, the trial court correctly instructed the jury on that theory.

As a fallback position regarding criminal responsibility, the defendant also argues that if the instruction was correctly included among those given to the jury, the trial court, nevertheless, erred in omitting an instruction on the natural and probable consequences rule regarding felony murder.

The law recognizes a three-part test for imposition of criminal liability based on the natural and probable consequences. *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000). Pursuant to that test, the state's evidence must show beyond a reasonable doubt and the jury must find:

> (1) the elements of the crime or crimes that accompany the target crime;
>
> (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and
>
> (3) that the other crimes that were committed were natural and probable consequences of the target crime.

*Id*.

Recently, in *State v. Robert Michael Winters*, No. E2002-00160-CCA-R3-CD (Tenn. Crim. App., Knoxville, Nov. 7, 2003), the court characterized the question whether the natural and probable consequences instruction was required for the felony murder count as "an intriguing one." *Robert Michael Winters*, slip op. at 16. The question has not lost its intrigue, and we adhere to the following view expressed in *Robert Michael Winters* that the natural and probable consequences instruction is not required in conjunction with a charge of felony murder.

"The [natural and probable consequences] rule underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." *Howard*, 30 S.W.3d at 276. In contrast, the felony murder statute . . . does not require that a homicide committed during the course of one of the enumerated felonies be foreseeable. *See* Tenn. Code Ann. § 39-13-202(a)(2) (1997 and 2003); *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000), *perm. app. denied* (Tenn. 2001). "When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." *Id*. (citing *State v. Brown*, 756 S.W.2d 700, 704 (Tenn. Crim. App. 1988)). . . . As such, . . . the trial court was not required to give the natural and probable consequences instruction for the felony murder count.

*Id.*

## B. Lesser-Included Offense

In his next issue, the defendant maintains that his aggravated arson conviction should be reversed and that a new trial should be ordered because the jury was not instructed on the offense of setting fire to personal property as a lesser-included offense. The state disputes that setting fire to personal property is a lesser-included offense and, alternatively, argues that harmless error cures any possible instructional deficiency. From the record before us, it appears that the defendant's objection was first raised in his motion for new trial and, thereafter, denied.[2]

When an issue is raised regarding the trial court's failure to instruct on a lesser-included offense, we must determine: (1) whether the offense is a lesser-included offense under the test adopted in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999); (2) whether the evidence supports an instruction on the lesser-included offense; and (3) whether the failure to instruct on the lesser-included offense constitutes harmless error. *State v. Reginald D. Terry*, __ S.W.3d __, No. W2001-03027-SC-R11-CD, slip op. at 2 (Tenn., Jackson, Oct. 30, 2003); *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002).

---

[2] The defendant's case was tried in the latter part of 2001, prior to the effective date of the waiver provisions of Code section 40-18-110 regarding the failure to request a lesser-included offense instruction. *See* Tenn. Code Ann. § 40-18-110(c) (2003) (governing trials conducted on or after January 1, 2002) ("[W]hen the defendant fails to request the instruction of a lesser included offense as required by this section, such instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.").

Pursuant to the test adopted in *Burns*, an offense is lesser-included if:

(a) all of its statutory elements are included within the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing:

(1) a different mental state indicating a lesser kind of culpability; or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of facilitation, attempt or solicitation of the offense charged.

*Burns*, 6 S.W.3d at 466-67.

As relevant to this case, the crime of aggravated arson occurs when a person commits arson, as defined in section 39-14-301 or 39-14-303,[3] and one or more persons are present therein, or any person suffers serious bodily injury as a result of the fire or explosion. Tenn. Code Ann. § 39-14-302 (2003). This statute embodies several alternative modes for committing aggravated arson. The mode of criminal conduct charged in the indictment in the present case invoked the section 39-14-301 variety of arson; specifically, the indictment alleged the defendant knowingly damaged the structure located at 332½ Martin Luther King Boulevard, without the consent of all persons having a possessory, proprietary, or security interest therein, and while one or more persons were present in the structure.

---

[3] Code section 39-14-301 provides that "[a] person commits [arson] who knowingly damages any structure by means of a fire or explosion[,] . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein." Tenn. Code Ann. § 39-14-301(a)(1) (2003).

Code section 39-14-303 is captioned, "Setting fire to personal property or land," and it reads in relevant part,

(a) A person commits arson who knowingly damages any personal property, land, or other property, except buildings or structures covered under § 39-14-301, by means of fire or explosion:

(1) Without the consent of all persons who have a possessory or proprietary interest therein; or

(2) With intent to destroy or damage any such property for any unlawful purpose.

Tenn. Code Ann. § 39-14-303(a)(1), (2) (2003).

A completely different variety of arson is set forth in section 39-14-303, and it expressly excludes buildings or structures covered under section 39-14-301. *See id*. § 39-14-303(a) (2003) ("A person commits arson who knowingly damages any personal property, land, or other property, *except buildings or structures covered under § 39-14-301*, by means of a fire or explosion.") (emphasis added). It is this mode or variety of arson that the defendant claims should have been instructed as a lesser-included offense. We disagree.

An analysis of lesser-included offenses often entails a comparison of a specific mode of the greater offense with a specific, related mode of the lesser offense. *See State v. Moore*, 77 S.W.3d 132, 134-36 (Tenn. 2002) (holding that reckless endangerment is not a lesser-included offense of aggravated assault committed by intentionally or knowingly causing another to reasonably fear imminent bodily injury by use or display of a deadly weapon). Such a comparison in this case reveals that the "personal property, land, or other property, except buildings or structures" element required for setting fire to personal property or land is not an element necessary to establish aggravated arson as alleged in the indictment. Because all of the elements of setting fire to personal property or land cannot be incorporated into the elements of aggravated arson alleged in the indictment in this case, part (a) of the *Burns* test is not satisfied.

The next consideration is whether the disparate element, "personal property, land, or other property, except buildings or structures," qualifies as an exception afforded by part (b)(1) or (b)(2) of the *Burns* test. In our opinion, the element does not qualify for the (b)(1) exception because it does not relate to the relevant mental state. Likewise, application of the (b)(2) exception to the disparate element does not transform the offense of setting fire to personal property or land into a lesser-included offense. The (b)(2) exception speaks in terms of "a less serious harm or risk of harm *to the same* person, *property* or public interest." *Burns*, 6 S.W.3d at 467 (emphasis added). The property specified in section 39-14-301, "any structure," is not the same property specified in section 39-14-303, "personal property, land, or other property, *except buildings or structures covered under § 39-14-301."* (Emphasis added).

Finally, part (c) of the *Burns* test does not apply because setting fire to personal property or land does not consist of facilitation, attempt, or solicitation of aggravated arson.

Our ruling that setting fire to personal property or land is not a lesser-included offense in this case disposes of the defendant's claim without involving any harmless error analysis. Had we concluded, however, that an instructional error occurred, it seems abundantly clear that it would be categorized as harmless inasmuch as the jury was offered the option of convicting the defendant of the lesser-included offenses of arson and reckless burning but rejected those in favor of the greater offense. *See Allen*, 69 S.W.3d at 189.

### C. "Knowing" *Mens Rea* Jury Instruction

The defendant's final jury instruction challenge is that the trial court erroneously instructed the jury on the knowing element of aggravated arson. Relying on *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), the defendant argues that the instruction improperly and

harmfully permitted a conviction based only upon an awareness of the nature of his conduct or that a particular circumstance existed and that the instruction should have but did not require the jury to determine that the defendant was aware that his conduct was reasonably certain to cause the result.

The defendant's argument is predicated on the definition of "knowing" set forth in Code section 39-11-302(b). The mental state of "knowing" is defined in terms of three possible conduct elements: (1) the nature of the defendant's conduct; (2) the circumstances surrounding the defendant's conduct; and (3) the result of the defendant's conduct. *See* Tenn. Code Ann. § 39-11-302(b) (2003); *Page*, 81 S.W.3d at 787. Offenses within the third category are referred to as "result-of-conduct" offenses. *See State v. Ducker*, 27 S.W.3d 889, 895-96 (Tenn. 2000).

We must first determine if, as the defendant contends, the offense of aggravated arson is a result-of-conduct offense. This is an issue of first impression, and the answer is not entirely clear-cut. Ultimately, however, we believe that the supreme court's description of result-of-conduct offenses in *Ducker* excludes aggravated arson from the result-of-conduct category.

In *Ducker*, the supreme court described a result-of-conduct offense in the following fashion:

> A result-of-conduct offense requires that the culpable mental state accompany the result as opposed to the nature of the conduct. . . . The focus is on whether the actor possessed the required culpability to effectuate the result that the legislature has specified. Generally, an offense may be classified as a result-of-conduct offense when the result of the conduct is the only element contained in the offense.

*Ducker*, 27 S.W.3d at 896. To illustrate the point, the supreme court then called forth Tennessee's second degree murder statute.[4]

> An example of a result-of-conduct offense is second degree murder, which is defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). In second degree murder, the result of the conduct is the sole element of the offense. The "nature of the conduct" that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death. The intent to engage in conduct is not an explicit element of the state's case in second degree murder. Accordingly, a result-of-conduct crime does not require as an element that an actor

---

[4] *Ducker* was not a second degree murder prosecution. The defendant was indicted on two counts of first degree murder for the reckless killing of a child. *Ducker*, 27 S.W.3d at 892. The *Ducker* court held that Tennessee's child abuse and neglect offenses are not result-of-conduct offenses. *Id*. at 897.

-11-

engage in a specified course of conduct to accomplish the specified
result.

*Id*.

Under our arson statutes, a person commits aggravated arson "who commits arson" under additional, specified circumstances necessary to elevate the arson into aggravated arson. Tenn. Code Ann. § 39-14-302(a)(1), (2) (2003). Simple arson is defined in terms of a person "who *knowingly* damages any structure by means of a fire or explosion." *Id*. § 39-14-301(a) (2003) (emphasis added). Grammatically speaking, the word "knowingly" modifies "damages," which refers to the result of the person's conduct. Nonetheless, the arson statute does not focus purely on the result -- that is, damage to a structure. Instead, the nature of the conduct -- creating a fire or explosion -- that causes the damage to the structure is consequential and central to the offense. Measured according to the parameters set forth in *Ducker*, arson and aggravated arson, therefore, are not result-of-conduct offenses; they do not require that a defendant act with an awareness that setting a fire or creating an explosion is reasonably certain to cause damage to a structure.

To summarize, we hold that aggravated arson is not a result-of-conduct offense and, therefore, we reject the defendant's complaint that the jury was improperly instructed on the "knowing" element of aggravated arson. Even, however, were we to accept the defendant's argument that aggravated arson is a result-of-conduct offense, we are confident that any instructional error would be harmless, because identity of the individual setting the fire was the central disputed issue at trial. *See Page*, 81 S.W.3d at 789 (suggesting an erroneous *mens rea* instruction would likely be harmless when identity, not *mens rea,* was the disputed issue at trial).

## II. PROSECUTORIAL MISCONDUCT:  INCONSISTENT POSITIONS

The defendant frames his next issue in terms of prosecutorial misconduct generated by pursuing inconsistent theories of guilt. The defendant argues that the state advanced impermissibly inconsistent positions when it indicted both Orr and the defendant but then permitted Orr to testify that the defendant acted alone. We disagree; in our opinion, no such prosecutorial misconduct has been shown to have occurred.

The concept of "prosecutorial inconsistency" was examined at length in the recent decision in *State v. Gregory Robinson*, No. W2001-01299-CCA-R3-DD (Tenn. Crim. App., Jackson, Aug. 13, 2003), *perm. app. pending*. In that case, Robinson was found guilty of premeditated first degree murder based on a theory of criminal responsibility for the conduct of another and was sentenced to death. The jury also found him guilty of especially aggravated kidnapping, for which he received a 25-year sentence.

The *Gregory Robinson* court treated the issue as one of first impression in this state. Upon canvassing cases from other jurisdictions, the court first determined that "no uniform body of law exists for addressing the issue." *Gregory Robinson*, slip op. at 16. The concept, where recognized, holds that the prosecution's use of factually contradictory theories in separate trials of

-12-

different defendants offends due process because "the justice system . . . demands that [prosecutors] act in the interests of justice rather than conducting themselves as mere advocates." *Gregory Robinson*, slip op. at 17 (citing *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir.), *cert. denied sub nom. Gammon v. Smith*, 531 U.S. 985, 121 S. Ct. 441 (2000)).

The *Gregory Robinson* court aligned itself with those jurisdictions recognizing prosecutorial inconsistency as the basis for a due process violation. The court, however, carefully and expressly qualified its approach to the issue. "We emphasize . . . that such due process claims are unusual, will not often occur, and must exist at the core of the prosecution's case in order to justify relief." *Gregory Robinson*, slip op. at 17; *see Smith*, 205 F.3d at 1052 (due process does not require the prosecution to "present precisely the same evidence and theories in trials for different defendants"). Furthermore, a defendant must establish not only prosecutorial inconsistencies but also that "prosecutorial inconsistencies led to a reasonable likelihood that the outcome of the trial would be different absent the inconsistencies." *Gregory Robinson*, slip op. at 17 (citing and adopting the "materiality" standard applied to suppression of exculpatory evidence formulated in *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985)).

With these principles in mind, we do not believe that a due process violation occurred in this case. On the most basic level, due process was not violated because contradictory evidence and/or arguments were not presented to separate juries during the course of trying co-defendants for the same offense. Orr never went to trial on the homicide or aggravated arson charges; there are no separate trials to compare.

Furthermore, prosecutorial discretion in the charging process is vast and generally is not open to challenge. *See Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207 (Tenn. 1999).

> A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court.

*Young v. United States*, 481 U.S. 787, 807, 107 S. Ct. 2124, 2137 (1987). The defendant insists that if the state believed that Orr was credible, it was prosecutorial misconduct not to dismiss the charges against her. That complaint aims at the heart of prosecutorial discretion in the charging process, which we are not at liberty to disturb.

We discern no basis to disturb the defendant's convictions as the result of prosecutorial inconsistency.

-13-

### III. SUFFICIENCY OF THE EVIDENCE

Although the defendant challenges the legal sufficiency of the convicting evidence, he does so by reference to other issues that he has raised and that we have rejected. He claims that the evidence was inadequate to convict him under a theory of criminal responsibility and that there was insufficient proof that he knowingly damaged the structure or contributed to the death of Ms. Young. These claims require no lengthy discussion.

When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

We previously ruled that it was not error for the trial court to give an instruction on criminal responsibility. As discussed in Section I. A. above, a reasonable jury, viewing the evidence in the light most favorable to the state, could have deduced that both Orr and the defendant were involved in the conflagration. The evidence, we hold, is sufficient to convict on the theory of criminal responsibility.

As for the evidence sufficiency related to the knowing *mens rea* for aggravated arson, we rejected the defendant's earlier argument that aggravated arson is a result-of-conduct crime. The evidence, therefore, was not required to show that the defendant was aware that his conduct was reasonably certain to damage the structure or result in Ms. Young's death.

The evidence is sufficient to support the defendant's convictions.

### IV. SENTENCE ENHANCEMENT: PRIOR CONVICTIONS

In his final issue, the defendant argues in summary fashion that the trial court improperly enhanced his sentence based on prior convictions that were not proven by certified copies

of the underlying judgments. The defendant does not assert what sentence he regards as appropriate, nor does he challenge any other aspect of sentencing.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. *See State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

The evidence before the court at the sentencing hearing consisted of the trial evidence, the presentence investigation report, and the testimony of the defendant's brother and brother-in-law. The live testimony was brief, with the defendant's relatives soliciting sentencing leniency from the court. Defense counsel interposed an oral objection to the criminal history portion of the presentence report on the basis that the state had not provided certified copies of the conviction judgments listed. No mitigation factors were offered for the court's consideration.

After hearing the arguments of the parties, the court imposed a maximum, two-year sentence for the criminally negligent homicide conviction. Tenn. Code Ann. §§ 39-13-212(b) (2003) (criminally negligent homicide Class E felony), 40-35-112(5) (2003) (Range I sentence for Class E felony, not less than one nor more than two years). It ordered a concurrent twenty-two-year sentence for the aggravated arson conviction, which was two years above the presumptive sentence. *Id*. §§ 39-14-302(b)(1) (2003) (aggravated arson Class A felony), 40-35-112(1) (2003) (Range I sentence for Class A felony, not less than fifteen nor more than twenty-five years), -35-210(c) (2003) (presumptive sentence for Class A felony is midpoint of range if no enhancement or mitigating factors). The court found no mitigating factors, and it applied two enhancement factors: a previous history of criminal convictions or behavior, *id*. § 40-35-114(2) (2003), and the personal injuries inflicted by the aggravated arson were particularly great, *id*. § 40-35-114(7) (2003).

The defendant's complaint appears to raise a question of law, whether certified copies of prior convictions must be introduced before a trial court can consider and apply enhancement factor (2). That question has been resolved adversely to the defendant's position. *See State v. Adams*, 45 S.W.3d 46, 59 (Tenn. Crim. App. 2000) (presentence report constitutes reliable hearsay; certified copies of convictions unnecessary to prove prior criminal history; courts can rely on presentence report). The convictions in this case were reported in the presentence report. The defendant did not contest the accuracy of the information regarding the listed convictions. Moreover, the trial court stated that it only considered the Tennessee convictions listed in the report and disregarded four out-of-state convictions. Finally, the trial court pointed out that the defendant's admitted marijuana and crack cocaine use supported application of enhancement factor (2) in terms of "criminal behavior," a determination with which we agree. *See* Tenn. Code Ann. § 40-35-114(2) (2003) (previous history of "criminal behavior"); *State v. Moss*, 13 S.W.3d 374, 388-89 (Tenn. Crim.

App. 1999) (defendant's admitted marijuana manufacturing for personal use considered prior criminal behavior).

## CONCLUSION

Discerning no basis for this court to disturb the defendant's criminally negligent homicide and aggravated arson convictions or for this court to interfere with the sentences imposed by the trial court, we affirm the trial court's judgments.

_____

JAMES CURWOOD WITT, JR., JUDGE