JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Alvin Walton ("Walton"), appeals his conviction. Finding no merit to the appeal, we affirm.
 {¶ 2} In 2005, Walton was charged with aggravated murder and aggravated burglary. Both counts contained one-and three-year firearm specifications. Walton was also charged with having a weapon while under a disability. The matter proceeded to trial twice, both resulting in mistrials. The third trial began in May 2006.
 {¶ 3} The following evidence was adduced at the third trial.
 {¶ 4} The deceased, Van Echols ("Echols"), lived with his girlfriend, Veronica Malloy, and her children at her mother's house on East 49th Street in Cleveland. Both Echols and Veronica Malloy abused drugs. Veronica often bought her drugs from Walton.
 {¶ 5} A few months prior to the murder, Echols took part in the robbery of local drug dealer, Charles Pinson ("Pinson"). Pinson was Walton's roommate and also dated Echols' sister, Tina, who was present during the robbery. Echols' former girlfriend testified that, after the robbery, Walton was searching for Echols and told her that he and Pinson were "out to get" Echols.
 {¶ 6} In the early morning hours of May 21, 2005, Walton drove to the Malloys' house in a pickup truck and honked the horn. Veronica went outside, thinking it was her friend "T" in the truck. As she approached the truck, however, *Page 4 
she recognized Walton as the driver in T's truck. Another unidentified man was with Walton. Veronica ran back into her mother's house with Walton following.
 {¶ 7} At that time, a neighbor, Deborah Peterson ("Peterson"), heard a disturbance and, as she looked out her window, she saw two men banging on the Malloys' door.
 {¶ 8} Veronica, her son, and her mother, Karen Malloy, testified that Walton smashed the window next to the front door and tried to enter by putting his arm through the window, reaching for the doorknob. Eventually, Walton gained entry into the house and searched for Echols. He questioned the Malloys as to his whereabouts. At one point, Walton searched for a crack rock he claimed he had dropped. He also pulled out his crack pipe, but Veronica ordered him not to smoke crack in front of her mother and the children. Later, Walton offered to repair the door and left one of his business cards. He also commented that he was not there to kill Echols.
 {¶ 9} While Walton was in the house, Echols telephoned Veronica. Walton took the phone from Veronica and argued with Echols. At the same time, Walton received a call on his cell phone. The cell phone records produced at trial indicated that the call was one of many made that evening from Pinson's cell phone to Walton's cell phone.
 {¶ 10} Echols' sister, Tina, testified that Echols was at her house when he called Veronica. He argued on the phone and then left to check on Veronica. As *Page 5 
soon as her brother pulled out of the driveway, Tina saw what she identified as Pinson's gold-colored car pull in, quickly exit her driveway, and follow Echols.
 {¶ 11} Echols returned to the Malloys' house but was unable to enter through the jammed front door. When Walton heard Echols on the porch, he exited the house through another door. Peterson, who was watching from her window, saw Echols arguing with a bald-headed man. She saw Echols start to run and then heard the bald man shout, "Don't run." Peterson then observed the bald man raise his gun and shoot Echols.
 {¶ 12} Echols continued to flee. As the first shot was fired, Peterson saw a gold-colored car pull up and follow the shooter as he chased Echols. Peterson lost sight of the parties and called 911. While on the phone with the operator, Peterson heard two more gunshots. She described the shooter as a black male, bald, and wearing all black.
 {¶ 13} The police found Echols' body in a neighbor's driveway. He had been shot twice in the back and the neck. The police recovered Walton's jacket in a nearby alley. The jacket tested positive for Walton's DNA and gunshot residue.
 {¶ 14} The jury convicted Walton of the lesser-included offenses of murder and burglary. He was acquitted of the firearm specifications but convicted by the court of having a weapon while under a disability. The court sentenced Walton to fifteen years to life, to be served concurrent to eight years for burglary and five years for having a weapon while under disability. *Page 6 
 {¶ 15} Walton appeals his conviction, raising eight assignments of error, which will be combined when possible for review.
 {¶ 16} In the first assignment of error, Walton argues that he was denied due process when the State proceeded against him using inconsistent theories. In the second assignment of error, he claims that the trial court erred in instructing the jury regarding aiding and abetting.
 {¶ 17} Walton first argues that the State improperly pursued inconsistent theories of his guilt because the State treated Walton as the principal offender in the first and second trials and throughout the third trial. Because the State pursued Walton as the principal offender, he argues that the State should have been prohibited from also proceeding on a complicity theory and requesting a jury instruction on aiding and abetting.
 {¶ 18} Walton cites Smith v. Groose (8th Cir. 2000),205 F.3d 1045, to support his argument that the State should have been prevented from pursuing both theories against him. In Groose, the court found error when, in separate trials, two defendants were convicted of the same murders. At the separate trials, the same prosecution witness gave "diametrically opposed" testimony, resulting in the separate convictions of two defendants. Id. The court held that the State was forbidden from using irreconcilable theories to secure convictions against two separate defendants in prosecutions for the same offenses arising out of the same event. Id. at 1049. *Page 7 
 {¶ 19} In the instant case, there is no evidence that the State used irreconcilable theories to secure convictions against two defendants in prosecutions for the same offenses arising out of Echols' murder. Although defense counsel at trial pursued the theory that Pinson actually committed the murder, the record does not indicate whether Pinson was ever charged in connection with Echols' death.
 {¶ 20} Moreover, the State's choice to pursue an alternate theory against Walton is permissible. R.C. 2923.03(F) states that "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense." "Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is `stated * * * in terms of the principal offense' and does not mention complicity." State v.Herring, 94 Ohio St.3d 246, 251, 2002-Ohio-796, 762 N.E.2d 940. Furthermore, Crim.R. 33(E)(2) provides that a variance between the allegations and the evidence at trial is not reversible error unless the defendant can show he was prejudiced or misled.
 {¶ 21} Based on the record in this case, we find that the State's decision to pursue Walton as both the principal and the non-principal did not prejudice or mislead him. Walton does not indicate how he would have defended himself differently, or what evidence he would have presented had the State given him notice that it was pursuing a complicity theory.
 {¶ 22} Moreover, defense counsel conceded in opening argument that Walton was at the scene when the crime occurred and that Walton was attempting to *Page 8 
recover Pinson's money and drugs from Echols. We agree with the State's argument that this was sufficient to place Walton on notice that a complicity theory might be pursued by the State. Although witnesses testified that Walton fired the first shot at Echols, it is unclear who fired the second and third shots and which shot killed Echols. Although the State concedes it consistently pursued Walton as the principal offender, we find that the evidence presented at trial also supported an instruction on aiding and abetting.
 {¶ 23} Walton also argues that the jury instruction itself was flawed because it did not comport with standard Ohio Jury Instructions. He claims that the trial court erred when it failed to inform the jury that to convict Walton under a complicity theory it must find that Walton acted with the same culpability as the principal offender.
 {¶ 24} We believe the instructions adequately explained the elements of conspiracy and aiding and abetting. Furthermore, although Walton objected to the inclusion of any instruction on aiding and abetting, he was given the opportunity to review the specific instruction and never objected to the form of the instruction.
 {¶ 25} Therefore, the first and second assignments of error are overruled.
 {¶ 26} In the third and fourth assignments of error, Walton argues that the trial court erred in denying his motion for judgment of acquittal as to aggravated murder and aggravated burglary.
 {¶ 27} A motion for judgment of acquittal, or a Crim.R. 29 motion, challenges the sufficiency of evidence presented by the State at trial. Walton claims that he was *Page 9 
denied due process and the right to a fair trial because the trial court overruled his Crim.R. 29 motions. However, Walton was acquitted of both aggravated murder and aggravated burglary and, therefore, he suffered no prejudice from the trial court's ruling.
 {¶ 28} The third and fourth assignments of error are overruled.
 {¶ 29} In the fifth assignment of error, Walton argues that the trial court erred when it instructed the jury as to the lesser-included offense of murder.
 {¶ 30} Walton argues that because the State pursued him as the principal offender and charged him with aggravated murder, the trial court's instruction on murder was a denial of his due process rights. The State's charging and theory of guilt, however, are not a consideration in giving an instruction on a lesser-included offense. Rather, a court must give an instruction on the lesser offense "where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Thomas (1988), 40 Ohio St.3d 213, 533 N.E. 2d 286, paragraph two of the syllabus. Since the evidence presented in this case would reasonably support an acquittal on aggravated murder and a conviction on murder, we find no error in the court's giving the instruction.
 {¶ 31} The fifth assignment of error is overruled.
 {¶ 32} In the sixth and seventh assignments of error, Walton argues that his convictions were against the manifest weight of the evidence. *Page 10 
 {¶ 33} In evaluating a challenge to the verdict based on the manifest weight of the evidence, a court sits as the thirteenth juror, and intrudes its judgment into proceedings that it finds to be fatally flawed through misrepresentation or misapplication of the evidence by a jury that has "lost its way." State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52. As the Ohio Supreme Court declared:
 "Weight of the evidence concerns the ` inclination of the greater amount of credible evidence offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' * * *
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
 {¶ 34} In State v. Bruno, Cuyahoga App. No. 84883, 2005-Ohio-1862, we stated that the court must be mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact. A reviewing court will not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the prosecution proved the offense beyond a reasonable doubt. State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, 383 N.E.2d 132. Moreover, in reviewing a claim that a conviction is against the manifest weight of the evidence, the conviction cannot be reversed unless it is obvious that the trier of fact clearly lost *Page 11 
its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v.Garrow (1995), 103 Ohio App.3d 368, 659 N.E.2d 814.
 {¶ 35} Walton argues that the jury lost its way in convicting him of murder because the evidence adduced at trial showed that Pinson committed the murder. Walton also claims that he should not have been convicted under the alternative theory that he aided or abetted Pinson, although he fails to support this argument. Walton further argues that Veronica let him into her mother's house, so he should not have been convicted of burglary. Finally, Walton argues that the trial court should not have convicted him of the weapons charge because the jury acquitted him of the gun specifications.
 {¶ 36} We find that, under either theory of guilt, there was substantial evidence that Walton was guilty of the crimes of which he was convicted.
 {¶ 37} Walton's former girlfriend testified that Walton and Pinson were "out to get" Echols because Echols had robbed Pinson. Veronica, Karen, and Veronica's son testified that Walton broke into the house looking for Echols. Despite discrepancies between Karen's and Veronica's testimony regarding how Walton finally gained entry into the house, both witnesses testified that he broke out the glass from the front door. Once Echols returned to Malloy's house, Walton ran from the house and confronted Echols. Karen and Veronica soon heard three gunshots. The neighbor testified that she observed a man matching Walton's description *Page 12 
shouting at Echols and saw that man shoot Echols. The neighbor also testified that a gold-colored car, matching the description of Pinson's car, pulled up as the first shot was fired and then followed Walton as he chased Echols.
 {¶ 38} Echols' sister testified that when her brother left her house to check on Veronica, she saw Pinson's car pull into her driveway and then follow Walton. Additionally, cell phone records demonstrated that Pinson called Walton nine times that evening. Another witness testified that Walton was with her smoking crack and left for a period of time in the early morning. When he returned, he was not wearing his jacket and asked the witness if he could hide in her house. The black jacket recovered by the police was identified by several witnesses as Walton's jacket and contained his DNA as well as gunshot residue.
 {¶ 39} Despite some discrepancies in witness testimony, we find that other aspects of the witnesses' descriptions were consistent. It was within the province of the jury to determine whether the witness testimony was sufficiently reliable and accurate to be worthy of belief. We further find that any minor inconsistencies do not lead to the conclusion that Walton's conviction is against the manifest weight of the evidence. On the contrary, the evidence presented at trial established that Walton pursued Echols in the weeks following the robbery of Pinson, lured him to the scene, informed Pinson of Echols' location, and participated in the murder.
 {¶ 40} Therefore, the sixth and seventh assignments of error are overruled. *Page 13 
 {¶ 41} In the eighth assignment of error, Walton argues that his right to a fair trial was violated when the State was "allowed to elicit unfairly prejudicial testimony compounded by [an] improper and unfairly prejudicial closing argument."
 {¶ 42} Walton argues that the State improperly elicited testimony from Tina Echols that she received "bad vibes" from Walton in relation to her brother's murder. A review of the transcript, however, shows that Tina Echols testified that she felt "bad vibes" when Walton told her to "get out of his face" the day Echols robbed Pinson. Thus, the statement was made in relation to the robbery, not Echols' murder. Although defense counsel objected to her response, we find that the State did not improperly question the witness.
 {¶ 43} Walton next argues that the prosecutor improperly stated during closing arguments that Walton was the head of the Pinson gang. A review of the State's closing argument, however, reveals that the State indicated that Charles Pinson, not Walton, was the head of the Pinson gang.
 {¶ 44} Thus, finding no error, the eighth assignment of error is overruled.
 {¶ 45} Accordingly, judgment is affirmed.
It is ordered that appellee recover of appellant the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's *Page 14 
conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 JAMES J. SWEENEY, P.J. and MELODY J. STEWART, J. CONCUR. *Page 1