[Cite as *State v. Walton*, 2023-Ohio-3872.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | Nos. 112127 and 112892 |
| v. | : | |
| ALVIN WALTON, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 26, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-05-466982-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sarah E. Hutnik, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Noelle A. Powell, Assistant Public Defender, *for appellant*.

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Defendant-appellant, Alvin Walton, appeals from the trial court's judgments denying his petition for postconviction relief and motion for leave to file a motion for new trial. Finding no merit to the appeal, we affirm.

## I.    Trial Testimony and Jury Verdict

{¶ 2}    In 2005, Walton was charged with one count each of aggravated murder and aggravated robbery for the murder of Van Echols, each count carrying one- and three-year firearm specifications.  He was also charged with one count of having weapons while under a disability.  The trial court's journal entry denying Walton's petition for postconviction relief accurately set forth the evidence adduced at trial and the jury's verdict as follows:

> At the time of his death, Echols was living with Veronica Malloy at 3239 East 49th Street in Cleveland.  For about a year before Echols's murder, Malloy also knew Alvin Walton — who went by the nickname "Kato" — as a person dealing drugs from an apartment across the street from her house.  On May 21, 2005, a little after midnight, Malloy heard a car horn just outside her house.  She looked out her window and saw a pickup truck owned by an acquaintance, so she went outside to see what was happening.  When she got to the truck she saw that Walton was driving the truck, not her friend.  Once she realized it was [Walton], she "turned around and ran inside the house and locked the door * * * because I knew there were going to be problems."
>
> Walton followed her and began pounding on her front door, eventually kicking it in and entering the house.  He told Malloy he was looking for Echols, and all she could tell him was that Echols was out at a bar, so Walton settled in to wait.  It was during this time that Walton handed his business card to Malloy and her mother and told them ["I'm not here to shoot him. I'm not here to hurt him.  Would I be passing out my business cards if I was?"][1] Soon the home phone rang.  Echols was on the other end of the line and Walton took the phone from Malloy and began to tell Echols that "everything was cool" and he "just needed to clean things up."  During that same call, Walton received a call on his cell phone, and Malloy heard Walton say that Echols was coming down Dolloff, one street over from East 49th.  Soon thereafter, Echols arrived at the broken front door and Walton went out the back door to chase him.  Malloy did not leave the house, but she heard three gun shots and

---

[1] A peculiar comment because, as the trial court's judgment entry noted, "no one had said anything about shooting or hurting anyone."

then she heard two vehicles pull away. At that point, she went outside and saw Echols's jacket in the driveway of the apartment across the street. Malloy began to look for Echols; in the meantime, her mother called the police.

Although [Malloy] could not see the shooting through her wall, Deborah Peterson had an unobstructed view of the slaying. Peterson lived at 3244 East 49th, across the street from Malloy. She testified that at 3:35 a.m., she "woke up to just hard banging" and looked outside to see two men on Malloy's porch. After banging on Malloy's door with no answer, the men got into a truck and left. She soon heard yelling in the street and looked out to see two men come off Malloy's porch. One of them — Echols, as it turned out, but Peterson only knew of him as Veronica Malloy's boyfriend — kept saying "I wouldn't do you that fucking way" while the other man repeated "you fucked me over, mother fucker." Echols then began to run and the other man ran after and shot him. Under cross-examination by defense counsel, Peterson — who is five feet and seven inches tall — acknowledged that the shooter "was about my height."

Peterson immediately called 911. During her trial testimony, she described the shooter as a black man with a bald head and wearing all black, but she admitted she did not see his face. She also testified that a gold Ford Taurus drove up, in reverse, alongside the shooter right after the first shot; then continued to drive next to him as he chased the victim until both the shooter and the car were out of sight.

Her rendition of events during the 911 call was somewhat different from her trial testimony. The entire 911 call was played at least twice in the hearing of the jury while Peterson testified. During the call, she said that the shooter got out of the gold Taurus before the shooting, but in her testimony, she stood by her assertion that the gold car pulled up after the first shot and there were only ever two men on the street, the killer and the killed. But Peterson's observation of the gold sedan was important because Echols's sister, Tina Echols, testified that the last place her brother was before getting murdered was her house, and that when he left her house, a gold four-door owned by Charles Pinson "made a U-turn real fast in my parking lot and zoomed behind my brother."

Pinson, as it happens, was Alvin Walton's best friend and roommate, and had known Van and Tina Echols for a number of years. Indeed, Pinson and Tina Echols dated for awhile, but that relationship ended about a month before the murder when Van Echols and others robbed

Pinson of money and drugs at Tina Echols's house. After that robbery, Pinson told Tina Echols that he was going to kill Van Echols.

One other fact about Charles Pinson was in evidence at trial: he is "approximately five-six or five-seven with a bald head."

When the police investigated the scene of the crime, they found a quilted black jacket that Veronica Malloy identified as the same jacket Walton was wearing when he broke into her house. A forensic examination of the garment revealed that Walton's DNA and gunshot primer residue were on it. Additionally, cell phone records showed calls between Pinson's phone and Walton's around the time of the murder.

At the state of Ohio's request, and over the defendant's objection, the court provided the jury with an instruction on accomplice liability.[2] Nevertheless, the thrust of the prosecutors' closing argument to the jury was that Walton was the shooter.

Walton's counsel, however, argued that Pinson shot Echols. The defense also tried to persuade the jury that the shooter couldn't have been Walton by pointing out that Deborah Peterson said the killer was five-foot-seven and "nobody in their right mind is going to confuse Alvin Walton as five-foot-seven."

The jury then returned verdicts of guilty on count one, murder under R.C. 2903.02, the lesser included offense of aggravated murder as charged, and count two burglary [the lesser included offense of aggravated burglary, as charged]. The jury, however, found Walton not guilty of all firearm specifications. Count three, having a weapon under a disability, was tried to the court and the judge found Walton guilty on that count. The defendant was then sentenced to a prison term of life with first parole eligibility after 15 years on the murder, and concurrent sentences of eight and five years on the other two counts. He remains in prison today.

---

[2] In the state's final argument to the jury, the prosecutor told the jury that "if it happened the way defense counsel suggested it did, this defendant is still guilty when you go through the law of aider and abettor. He's the one that went there. He's the one that got Van back to the killing site. He's the one that's chasing him down the street. He's the one that's been looking for him for weeks. He — if you believe his theory, he's still guilty." (Trial Transcript, p. 2267-2268.)

(10/20/22 Judgment Entry, p. 5-8.)

## II. Petition for Postconviction Relief and Motion for Leave to File a Motion for New Trial

{¶ 3} This court affirmed Walton's convictions on appeal. *State v. Walton*, 8th Dist. Cuyahoga No. 88358, 2007-Ohio-5070. Walton's discretionary appeal of that decision was denied by the Ohio Supreme Court, as was his application for reopening. *See State v. Walton*, 117 Ohio St.3d 1408, 2008-Ohio-565, 881 N.E.2d 275, and *State v. Walton*, 8th Dist. Cuyahoga No. 88358, 2009-Ohio-1234, respectively. Following the appellate litigation, Walton filed numerous pro se motions in the trial court. In September 2019, he filed a motion for leave to file a motion for new trial and, in October 2019, a petition for postconviction relief.

{¶ 4} Both motions claimed that Walton was entitled to a new trial because the state had suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[3] Specifically, Walton alleged that despite the state's assertion in its discovery response that "[n]o exculpatory material [was] available to or in the possession of the Prosecuting Attorney," the state had not disclosed prior to trial the existence of police reports regarding interviews with Larenzo Ealom and Walter Doss, two eyewitnesses to the shooting. Walton alleged

---

[3] In *Brady*, the Supreme Court of the United States held that a state violates the Fourteenth Amendment to the United States Constitution when it "withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012) (summarizing *Brady's* holding).

that he had only recently obtained the police reports through a public-records request.

{¶ 5} Exhibit C to Walton's petition was a typed statement dated June 1, 2005, prepared by Cleveland police detective Michael Beaman, signed by Ealom. According to Ealom's statement, as he and Doss were walking down an alley near East 49th Street, they heard two gunshots. Ealom said he then looked and saw "a guy named Van" being chased and shot at by a male who had a gun in his hand. Ealom said the gunman ran after Echols and then Ealom heard two more shots. According to Ealom, he and Doss ran but the male with the gun caught up with them at some point and pointed the gun at them. Ealom said he and Doss ran to his house, where he called the police. He then showed the police where the victim's body was. Ealom described the shooter as "a dark skin guy, dressed all in black * * * he might have been bald headed, but I could not tell for sure because he had a hood on." Ealom acknowledged that he initially told the police that he thought the shooter was "a male I knew named Anthony who lived in my hood, but after I thought about it, I knew it wasn't Anthony." Ealom's statement did not describe the shooter's height.

{¶ 6} Exhibit D to Walker's petition were supplemental police investigation reports dated May 21, 2005, prepared by Cleveland police detectives Sahir Hasan and Beaman summarizing their interviews with Ealom and Doss, both of whom reported observing the shooter chasing and shooting at the victim. Relevant to Walton's petition, in the summary of Doss's statement, the supplemental report stated, "This male and LARENZO EALOM describes the suspect as being a

B/M/AGE UNKNOWN, 5'07" TALL, MEDIUM BUILD, WEARING ALL BLACK CLOTHING." (Emphasis sic.)

{¶ 7}  Although the record reflects that Ealom and Doss were both listed on the witness list provided to defense counsel by the prosecutor prior to trial, in his petition, Walton asserted that the undisclosed police investigation reports contained exculpatory facts, including "two previously undisclosed eyewitnesses" to the shooting, one who said he initially thought the shooter was Anthony, and both who described the shooter's height as 5'7" tall.  Walton, who is 6'2" tall, alleged that but for this newly discovered evidence, he would not have been convicted.

## III.  Evidentiary Hearing

{¶ 8}  The trial court held an evidentiary hearing on Walton's petition for postconviction relief and motion for leave to file a motion for new trial.   The trial court admitted the transcript of Walton's third trial into evidence.[4]  In addition, the case file of Walton's trial counsel James McDonnell was subpoenaed in connection with the petition.[5]   McDonnell's file included five pages of detailed handwritten notes summarizing witness statements.  One of the handwritten pages stated, "2 guys in alley see shooting & knew D. Lorenzo _____ _____ _____ They insist police look for body."

---

[4] The first two trials ended in mistrials.

[5] Walton's other trial counsel, Kevin Cafferkey, informed the parties that he no longer has a case file relating to Walton.

{¶ 9} Walton submitted the following documentary evidence in support of his petition: (1) his pretrial motion for discovery and to examine exculpatory and mitigating material dated June 21, 2005; (2) the state's discovery response, dated July 13, 2005, in which it listed the witnesses it intended to call at trial, including Ealom and Doss, with their addresses, and indicated that "[n]o exculpatory material is available to or in the possession of the Prosecuting Attorney"; (3) Ealom's June 1, 2005 statement to Detective Beaman; (4) the May 1, 2005 Cleveland Police Department Supplementary Reports regarding Ealom and Doss; (5) a Cleveland Police Department Offense Report dated June 7, 2005, indicating that Walton is 6'2" tall; (6) Walton's affidavit averring he had not seen the supplementary police reports prior to or during trial; and (7) an August 19, 2005 report from Dennis Murphy, a private investigator appointed for Walton at the state's expense, in which Murphy stated that he had attempted to contact Ealom at the address on the state's discovery response but was advised that he did not live at that address and that he had found the address given for Doss to be a "bad address." (Tr. 49-50.)

{¶ 10} The state also submitted various documentary evidence, including subpoenas issued by the state for Ealom and Doss to appear at all three trials,[6] the prosecutor's handwritten case notes, and a Cleveland Police Department "Divisional Information" form dated May 21, 2005, prepared by Cleveland police officer Donald Nuti, stating that he had responded that day to a call for shots fired near East 49th

---

[6] They did not appear for any of the trials.

Street and interviewed various witnesses, including Ealom. Nuti's report stated that Ealom said he was walking on East 49th Street when he heard arguing, looked over, and saw a male he knew as "Al" tell another male "don't run mother fucker, don't run," and then saw "Al" shoot the victim three times, and twice more after the victim ran into a nearby backyard and fell. Ealom told the detective that "Al" then looked over and saw him and pointed the gun at him before Ealom ran away. (Tr. 79-80.)

{¶ 11} George Rukovena, the lead prosecutor on the case, testified at the evidentiary hearing that although he did "not have an independent recollection" regarding discovery in the case, his review of the case log demonstrated that there were a number of pretrials in the case and that he "gave complete oral discovery in accordance with Criminal Rule 16 and the methods and practices of the office at that time." (Tr. 87.) He testified that although it was not the state's discovery practice to give copies of documents in its possession to defense counsel, the methods and practices in 2005 were "at the pretrials to provide oral discovery, summarizing the case and the evidence to be presented at trial." (Tr. 87, 91.) He testified that although he would not give physical copies of police reports or statements to defense counsel, he would often "provide defense counsel an opportunity to review witness statements for the sake of expediency" and from time to time, he would read police reports verbatim to defense counsel. (Tr. 88-89.) Rukovena testified further that he had a "good working relationship" with defense counsel McDonnell and Cafferkey and that "everything was straightforward. There was no gamesmanship.

The facts of the case were not shaded. What was contained in the facts was revealed to defense counsel in an unbiased or unedited fashion." (Tr. 89.)

{¶ 12} On cross-examination, Rukovena admitted that he had no independent recollection of seeing the supplemental police reports indicating that Ealom and Doss identified the shooter as 5'7" tall and no independent recollection of telling defense counsel about those reports. Rukovena admitted further that the box was checked on the state's discovery response indicating that the state did not have any exculpatory evidence in its possession. (Tr. 93.)

{¶ 13} Andrew Nichol, the assistant prosecuting attorney at Walton's trial, testified that in 2005 and 2006, to obtain discovery, defense counsel would take notes as the prosecutors read witness statements and police reports to them. (Tr. 101.) The only paper copies given to defense counsel were the defendant's or co-defendant's statements. *Id.* Nichol testified that he did not conduct any of the discovery in this case and never spoke with Ealom or Doss. (Tr. 107, 109.)

{¶ 14} Walton's defense counsel, McDonnell, testified that he had "no idea" whether he was ever shown Exhibits C or D to Walton's petition, but that Rukovena was "one of the [prosecutors] that revealed everything, held nothing back, whether it was good or bad." (Tr. 180, 204.) He testified further that the defense was aware of Ealom and Doss prior to trial and that Murphy, their investigator, had unsuccessfully attempted to contact them. (Tr. 183.) McDonnell also testified that the handwritten notes from his file stating "2 guys in an alley see shooting and know D," etc., were from a pretrial, date unknown. (Tr. 185.) He acknowledged that at

some point during discovery, he was made aware that Ealom had identified Walton as the shooter (tr. 186), but said that he did not know if the prosecutor ever made him aware that Ealom described the shooter as 5'7" tall. (Tr. at *id.*) McDonnell testified, however, that knowing that Ealom had identified Walton as the shooter, he would not have put Ealom on the stand if he had known that Ealom had identified the shooter as 5'7" tall because despite the height discrepancy between the shooter and Walton, Ealom's testimony would "put Walton at the scene by someone who knew him." (Tr. 187.)

{¶ 15} On cross-examination, McDonnell testified that "based upon [his] recollection and the way the cases went it would not have helped Mr. Walton" to put Ealom on the stand because his "recollection of this case is that everybody knew everybody." (Tr. 201.) McDonnell explained that witnesses "will first say something and then change their testimony," (tr. at *id.*), and that putting Ealom on the stand would have allowed the prosecutor to bring out the fact that Ealom had first identified the shooter as "Al," thus helping the state make its case. (Tr. 202.)

## IV. The Trial Court Denies the Petition and Motion for Leave

{¶ 16} After the hearing, the trial court issued a judgment entry denying Walton's petition for postconviction relief. The court rejected the state's argument that the disclosure of Ealom's and Doss's names on the witness list was enough to demonstrate that Walton was not unavoidably prevented from discovering the evidence supporting his position. Nevertheless, the court found that the alleged *Brady* violation did not happen because "the evidence was not suppressed and the

handwritten notes of Walton's trial counsel, McDonnell, prove it." The court explained:

> As already described above, those notes first say "2 guys in alley see shooting." A review of Ealom's signed June 1, 2005 statement attached as exhibit C to Walton's petition for postconviction relief shows that he said "I was walking down the alley with my friend Walter." He then goes on to say that "I saw a guy behind Van with a gun in his hand, running after Van shooting at him." McDonnell's first note is a succinct and accurate summary of those portions of Ealom's statement. His note goes on to say "Lorenzo _____". Unquestionably this is a reference to the name of witness Larenzo Ealom, despite the misspelling of his first name. That portion of the note is followed by two lines, presumably representing the name of the second of the "2 guys in the alley," i.e., Walter Doss. Why McDonnell didn't write down the name can only be speculated about, but it is fair to conclude that he was given a name, otherwise there would not be any lines representing the name. The final portion of the note says "they insist police look for body." This is a direct paraphrase of the portion of Ealom's written statement where he says "I called the police and told them what happened and showed them where Van's body was." These notes leave no doubt that the witness statements were, at a minimum, orally disclosed to Walton's counsel during pretrial discovery.

(10/20/22 Judgment Entry, p. 11.)

{¶ 17} The trial court further found that "the inferential evidence" supported a finding that Ealom's and Doss's statements were disclosed to defense counsel. The court reasoned:

> If the suppression was intentional, why would a prosecutor intent on concealing evidence give a defendant the names and addresses of the witnesses who could supply that evidence and then subpoena those very witnesses for trial testimony? And if the suppression was inadvertent, why would a lazy prosecutor orally summarize every bit of the police investigation to defense counsel, including witness statements — as reflected by McDonnell's five pages of handwritten notes[7] — with the single exception of the version of events given by two

---

[7] Exhibit 15 from the hearing on Walton's petition.

witnesses? Finally, why would defense counsel instruct their investigator to seek out Doss and Ealom for statements — to the exclusion of almost every other witness in the case[8] — if they didn't have some knowledge of the substance of their statements and the possibility that they might provide information useful to the defense? These questions have no plausible answers that could buttress Walton's claim.

*Id.* at p. 11-12.

{¶ 18} The trial court found that "McDonnell's thorough notes" also defeated any contention that the shooter's height was not disclosed even though the notes contain no mention of height. *Id.* at p. 12. The court noted that in her 911 report, which Walton does not claim was not disclosed, Peterson described the shooter as 5'7" tall, and as evidenced by defense counsel's first question to Deborah Peterson on cross-examination at the first trial — "Do you recall telling the police that the person who did the shooting was 5'7" and stocky?" — "defense counsel obviously knew through pretrial discovery that Peterson had described the shooter as 5'7"." *Id.* Accordingly, the trial court concluded that "the specifics of McDonnell's notes notwithstanding, there is no reason to believe that the witnesses' estimates of the suspect's height were omitted from that disclosure." *Id.*

{¶ 19} The trial court also found that even if Walton could prove the evidence had been suppressed, there was no reason to believe that the evidence, in the context of the entire record and the jury's verdict, was exculpatory, nor that the result at trial would have been any different if the evidence had been disclosed. The court found

---

[8] Murphy, the investigator, appears to have been asked to interview only six prospective witnesses from a list of about 44.

that Walton's argument that Ealom's and Doss's description of the shooter as 5'7"
tall was unquestionably exculpatory because he is 6'2" tall "may be true in the
absence of any other evidence," but the jury in this case heard Peterson's testimony
that the shooter was 5'7" tall and nevertheless, returned a guilty verdict. The court
concluded that "[t]he difference, then, between the described height of the killer and
Walton's height wasn't enough to exculpate Walton in the minds of the 12 actual
jurors, which is better evidence of the effect of the testimony than Walton's surmise."
*Id*. at p. 13.

{¶ 20} The trial court found that even more importantly, Walton's argument
ignored the actual jury verdicts, which included not guilty findings on the firearm
specifications. The court explained that "[t]he only reasonable inference from that
finding is that the jury rejected the contention that Walton actually shot Van Echols
but [found] that he was still guilty of murder as an aider and abettor, presumably to
Charles Pinson." *Id*. The court reasoned, "[A] defendant's liability as an accomplice
to a principal offender is unrelated to any height, weight, or gender difference
between co-conspirators, and any such difference in this case must have been
rejected by the jury as inconsequential in the face of every other bit of evidence
proving Walton's involvement." *Id*.

{¶ 21} In summary, the trial court found that the evidence at issue was not
exculpatory, the evidence was disclosed to Walton through his defense counsel, and
even assuming the evidence was not disclosed, Walton was not prejudiced because

there is no reasonable probability that the result of the trial would have been any different if it had been disclosed. *Id*. at p. 14.

{¶ 22} The trial court also denied Walton's motion for leave to file a motion for new trial, finding that the motion was untimely under Crim.R. 33(B) because Walton was not unavoidably prevented from discovering the evidence he relies upon to support his motion for new trial. This appeal followed.

## V. Law and Analysis

### A. Petition for Postconviction Relief

{¶ 23} In his first assignment of error, Walton contends that the trial court erred in finding that he did not prove a *Brady* violation. In his second assignment of error, Walton contends that the trial court erred in denying his petition for postconviction relief because he established a *Brady* violation. Because they are related, we consider these assignments of error together.

{¶ 24} Under R.C. 2953.21:

Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * may file a petition in the court that imposes sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief.

{¶ 25} A petition for postconviction relief is a collateral civil attack on a criminal judgment, not an appeal of the judgment. *State v. Lenard*, 8th Dist. Cuyahoga No. 108646, 2020-Ohio-1502, ¶ 8, citing *State v. Steffen*, 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994). It is a means to resolve constitutional claims that

cannot be addressed on direct appeal because the evidence supporting the claims is outside the record. *State v. Milanovich*, 42 Ohio St.2d 46, 325 N.E.2d 540 (1975).

{¶ 26} Walton filed his petition for postconviction relief approximately 12 years after the trial transcript in his direct appeal was filed in the court of appeals; his petition is therefore untimely, a fact he does not dispute. *See* R.C. 2953.21(A)(2). R.C. 2953.21(A) precludes the trial court from entertaining an untimely petition for postconviction relief unless the petition meets two conditions. First, the petitioner must show either that he was unavoidably prevented from discovering the facts upon which he relies in his petition, or that the United States Supreme Court has recognized a new federal or state right that applies retroactively to the petitioner.[9] R.C. 2953.23(A)(1)(a). Second, the petitioner must show by clear and convincing evidence that a reasonable factfinder would not have found him guilty but for the constitutional error at trial. R.C. 2953.23(A)(1)(b).

{¶ 27} Because the timeliness requirement of R.C. 2953.23 is jurisdictional, a trial court does not have jurisdiction to entertain an untimely filed petition for postconviction relief that does not meet the exceptions set forth in R.C. 2953.23(A)(1). *State v. Barrow*, 8th Dist. Cuyahoga No. 108832, 2020-Ohio-3719, ¶ 7, citing *State v. Kleyman*, 8th Dist. Cuyahoga No. 93896, 2010-Ohio-3612, ¶ 35. Typically, a reviewing court reviews a trial court's decision granting or denying

---

[9] Walton does not claim the existence of a new right in his petition; accordingly, the only focus is on whether he was unavoidably prevented from discovering the evidence upon which he now relies.

a petition for postconviction relief for an abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. However, whether the trial court possessed subject-matter jurisdiction to entertain an untimely petition for postconviction relief is a question of law, which we review de novo. *State v. Apanovitch,* 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 24.

{¶ 28} To establish a due process violation under *Brady*, the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching; (2) was willfully or inadvertently withheld by the state; and (3) the defendant was prejudiced thereby. *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), citing *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

{¶ 29} Favorable evidence is material, and constitutional error results from its suppression, "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *State v. Royster*, 2d Dist. Montgomery No. 26378, 2015-Ohio-625, ¶ 16, quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine * * * confidence in the outcome of the trial.'" *Lemons v. State*, 2020-Ohio-5619, 164 N.E.3d 538, ¶ 65 (8th Dist.), quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The defendant bears the burden of demonstrating that a *Brady* violation rises to the level

of a denial of due process. *State v. Glover*, 2016-Ohio-2833, 64 N.E.3d 442, ¶ 35 (8th Dist.).

{¶ 30} For the trial court to have jurisdiction to entertain a *Brady* claim in an untimely petition for postconviction relief, the petitioner must first establish that he was unavoidably prevented from discovery of the facts on which he relies. *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, ¶ 21, citing R.C. 2953.23(A)(1)(a). The petitioner satisfies the "unavoidably prevented" requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the petitioner relies. *Id.* at ¶ 25.

{¶ 31} As support for his assertion that the subject evidence was suppressed, Walton argues that neither the prosecutor nor defense counsel had any independent recollection that the statements of Ealom and Doss identifying the shooter as 5'7" tall were provided to defense counsel, and thus, the trial court's conclusion that the evidence was disclosed was mere speculation. *See State v. Buehner*, 8th Dist. Cuyahoga No. 109699, 2021-Ohio-4435, ¶ 57, 62 ("In the absence of specific recollections or documentary evidence to establish clear disclosures," court declined to reject the petitioner's *Brady* claims merely because the prosecutor "had no reason to believe he would not have disclosed the witness statements pursuant to his common practice of meticulously ready each statement to counsel.").

{¶ 32} He further contends that despite the trial court's conclusion otherwise, McDonnell's handwritten notes actually prove that Ealom's and Doss's witness statement were not provided to defense counsel. As support for this

contention, he points out that the notes do not specifically mention that Ealom and Doss identified the shooter as 5'7" tall. He also argues that the first page of the supplementary police report gives Ealom's address as 3186 East 49th Street but on all other discovery documents, Ealom's address appears as 3324 East 49th Street. Walton notes that Murphy went to the 3324 East 49th Street address to talk to Ealom but was told he did not live at that address and contends that if the police report had been disclosed in its entirety to defense counsel, the investigator would have tried to reach Ealom at the alternative address.

{¶ 33} Walton also contends that it is apparent that defense counsel was not told that Ealom and Doss had identified the shooter as 5'7" tall, as specified on the supplemental police reports, because counsel did not use that information at trial. *See State v. Larkins*, 8th Dist. Cuyahoga No. 82325, 2003-Ohio-5928 (where state's witnesses testified that it was the prosecutor's "habit and custom" to be open in discovery and to read police reports and allow defense counsel to look at the file, but defense counsel affirmatively testified that he was not provided the exculpatory evidence from the newly discovered police reports and would have incorporated the evidence into his defense at trial, appellate court affirmed the trial court's ruling granting motion for new trial on the basis of newly discovered evidence, agreeing that the most persuasive indication that the defense did not possess the evidence was that it did not use it at trial).

{¶ 34} We are not persuaded and agree with the trial court that Walton did not establish that any evidence was suppressed, either purposely or inadvertently.

We recognize that Rukovena did not specifically remember disclosing the disputed evidence and McDonnell did not know whether he was ever given the evidence. However, as the trial court found, McDonnell's detailed handwritten notes, which he acknowledged were from a pretrial, demonstrate that Ealom's witness statement and the supplemental police reports were disclosed to defense counsel, even though they do not include a specific mention of the shooter's height as 5'7" tall.

{¶ 35} McDonnell's note that "2 guys in an alley see shooting" accurately summarizes Ealom's June 1, 2005 witness statement, as well as Ealom's and Doss's reports in the supplemental police reports that they were walking in an alley and saw the suspect chasing and shooting at the victim. The name "Lorenzo" followed by a line, and the two lines following indicate that McDonnell was given the names of Ealom and Doss, although it is unclear why McDonnell did not write down the full names. McDonnell's note that "[t]hey insist police look for body" accurately summarizes Ealom's June 1, 2005 written statement, in which he said, "I called the police and told them what happened and showed them where Van's body was." Although McDonnell's notes do not list the height of the shooter, we agree with the trial court that it is inconceivable that a prosecutor would relay, in detail, police reports and witness statements, with the single exception of two witnesses' description of the shooter. Furthermore, why would the prosecutor disclose that Deborah Peterson had described the shooter as 5'7" tall but then not disclose that Ealom and Doss gave a similar physical description of the shooter? And, as the trial court reasoned, why would a prosecutor intent on concealing evidence give the

defense the names and addresses of the witnesses who could supply the allegedly concealed evidence and then subpoena those witnesses for trial?

{¶ 36} Thus, the documentary and inferential evidence demonstrate that the disputed evidence was not suppressed. And because no evidence was suppressed, Walton failed to demonstrate that he was unavoidably prevented from discovering the facts upon which he relies in his petition, as required by R.C. 2953.23(A)(1)(a).

{¶ 37} Nevertheless, even assuming that Ealom's and Doss's identification of the shooter as 5'7" tall, and Ealom's statement that he initially thought the shooter was Anthony were suppressed, Walton did not demonstrate, pursuant to R.C. 2953.23(A)(1)(b), that no reasonable factfinder would have found him guilty but for constitutional error at trial. As the Supreme Court of Ohio stated in *Bethel*, "this question goes to the heart of *Brady*'s third prong, which requires [Walton] to show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 47, at ¶ 31, citing *Kyles*, 514 U.S. at 433, 116 S.Ct. 1555, 131 L.Ed.2d 490, quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.

{¶ 38} The *Brady* standard does not require Walton to show that the disclosure of the disputed evidence would have resulted in his acquittal. *Bethel* at ¶ 32, citing *Kyles* at 434. Rather, he must prove that "in the context of the entire record," *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342

(1976), suppression of the evidence "undermines confidence in the outcome of the trial." *Bethel* at *id.*, citing *Kyles* at 434, quoting *Bagley* at 678.

{¶ 39} Walton cannot make such a showing because, as the trial court found, the jury heard evidence that the shooter was 5'7" tall but did not acquit him; instead, the jury found him guilty as an aider and abettor to Echols's murder. We disagree with Walton's contention that this is "a wholly unfounded assumption." As this court stated in its decision regarding Walton's challenge on appeal to the propriety of the aider-and-abettor jury instructions at trial, "although defense counsel at trial pursued the theory that Pinson actually committed the murder,"

> defense counsel conceded in opening argument that Walton was at the scene when the crime occurred and that Walton was attempting to recover Pinson's money and drugs from Echols. * * * Although a witness testified that Walton fired the first shot at Echols, it is unclear who fired the second and third shots and which shot killed Echols. Although the state concedes it consistently pursued Walton as the principal offender, we find that the evidence presented at trial also supported an instruction on aiding and abetting.

*Walton*, 8th Dist. Cuyahoga No. 88358, 2007-Ohio-5070, at ¶ 19, 22. It is not "wholly unfounded" to assume that the jury followed its instructions on aiding and abetting. By finding Walton not guilty of the firearm specifications but guilty of murder, it is apparent that the jury believed that even if Walton did not shoot Echols, he aided someone else, presumably Pinson, in killing him.

{¶ 40} In considering whether the result of the proceeding would have been different had the evidence been disclosed to the defense, "the question [we must ask] is whether we can have confidence in the jury's verdict," even assuming the

prosecution suppressed Ealom's and Doss's description of the shooter and Ealom's statement that he initially thought the shooter was Anthony. *Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, at ¶ 34, citing *Kyles*, 514 U.S. at 434, 116 S.Ct. 1555, 131 L.Ed.2d 490.

{¶ 41} We conclude that we can. The jury heard Deborah Peterson's testimony that the shooter was 5'7" tall, as well as defense counsel's argument that Walton was not the killer because "nobody in their right mind is going to confuse Alvin Walton as five-foot-seven." Two more witnesses testifying to the shooter's height as 5'7" tall or one witness testifying that he initially mistakenly thought the shooter was Anthony would not have changed the jury's verdict that Walton was an accomplice to Echols's murder because, as the trial court found, Walton's liability as an accomplice is unrelated to his height or to a witness's initial mistaken belief about the identity of the shooter. There is simply no reason to believe that the allegedly suppressed evidence would have changed the result of the trial in any way, especially in light of the defense's concession that Walton was at the scene of the crime attempting to recover money and drugs from Echols.

{¶ 42} Furthermore, Ealom's and Doss's description of the shooter as 5'7" tall would have been merely cumulative to Deborah Peterson's testimony that the shooter was 5'7" tall. "There is no *Brady* violation 'if the evidence that was allegedly withheld is merely cumulative to evidence presented at trial.'" *Buehner*, 8th Dist. Cuyahoga No. 109699, 2021-Ohio-4435, at ¶ 42, quoting *State v. Bonilla*, 2d Dist. Greene No. 2008 CA 68, 2009-Ohio-4784, ¶ 26. Under the *Brady* standard, a

petitioner must prove that in the context of the entire record, suppression of the subject information undermines confidence in the outcome of the trial. *Bethel* at ¶ 34, citing *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392, 49 L.Ed.2d 342. On this record, it is apparent that the subject evidence was immaterial for *Brady* purposes because its disclosure would have been cumulative to other evidence at trial and would not have changed the result at trial in any way.

{¶ 43} In sum, Walton has not proven a *Brady* violation, nor shown that he was unavoidably prevented from discovering the facts upon which he relies in his petition and by clear and convincing evidence that no reasonable factfinder would have found him guilty as an aider and abettor but for constitutional error at trial, as required by R.C. 2953.23(A)(1). Therefore, the trial court lacked jurisdiction to entertain Walton's untimely petition and properly denied it.[10] The first and second assignments of error are overruled.

---

[10] In its journal entry denying Walton's petition, the trial court stated that it was combining a decision on the merits of the petition with its decision on the timeliness of the petition because the disposition of whether there was a *Brady* violation would "almost mostly" decide the merits of the petition. (10/20/2022 Journal Entry, p. 10). A trial court has no jurisdiction to consider the merits of an untimely petition, however, unless the requirements of R.C. 2953.23 have been established. Nevertheless, the trial court correctly denied the petition because Walton failed to demonstrate that he met the requirements of R.C. 2953.23(A)(1) to allow the court to consider the merits of the *Brady* claim in his untimely petition.

## B. Motion for Leave to File a Motion for New Trial

{¶ 44} In his third assignment of error, Walton contends that the trial court erred in denying his motion for leave to file a motion for new trial because he established a *Brady* violation.

{¶ 45} Motions for a new trial are governed by the framework provided in Crim.R. 33. Crim.R. 33(B) requires a motion for a new trial to be made within 14 days after a verdict is rendered. If a motion for a new trial is made on grounds of newly discovered evidence, the motion must be filed within 120 days after the day the verdict is rendered. *Id.* A defendant may file a motion for a new trial outside the 120-day deadline only by leave of court and only if "it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely." *Id.* Because the 120-day deadline has expired, Walton had to establish by clear and convincing evidence that he was unavoidably prevented from discovering the subject evidence as a predicate for obtaining leave. *State v. Shabazz*, 8th Dist. Cuyahoga No. 100623, 2014-Ohio-3142, ¶ 9.

{¶ 46} We review the trial court's ruling denying the motion for leave to file a motion for new trial under the abuse-of-discretion standard. *State v. Gray*, 8th Dist. Cuyahoga No. 92646, 2010-Ohio-11, ¶ 19. "'Abuse of discretion' is a term of art, describing judgment neither comporting with the record, nor reason." *Klayman v. Luck*, 8th Dist. Cuyahoga Nos. 97074 and 97075, 2012-Ohio-3354, ¶ 12, citing *State v. Ferranto*, 112 Ohio St. 667, 676-677, 148 N.E. 362 (1925). "'A decision is

unreasonable if there is no sound reasoning process that would support that decision.'" *Klayman* at *id.*, quoting *AAAA Ent. Inc. v. River Place Comm. Urban Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 47} The trial court denied Walton's motion for leave to file a motion for new trial upon finding that he was not unavoidably prevented from discovering the evidence he relies upon to justify the motion for new trial. We find no abuse of discretion.

{¶ 48} "The 'unavoidably prevented' requirement in Crim.R. 33(B) mirrors the 'unavoidably prevented' requirement in R.C. 2953.23(A)(1)." *Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, at ¶ 59, quoting *State v. Barnes*, 5th Dist. Muskingum No. CT 2017-0092, 2018-Ohio-1585, ¶ 28. As discussed above, because the state did not suppress Ealom's witness statement and the supplemental police reports, Walton failed to establish that he was unavoidably prevented from discovering the evidence upon which he now relies. Walton also failed to establish that the allegedly suppressed evidence would have changed the result of the trial in any way. Accordingly, the trial court did not abuse its discretion in denying his motion for leave to file a motion for new trial. The third assignment of error is overruled.

## C. Clear and Convincing Evidence

{¶ 49} In his fourth assignment of error, Walton contends that the trial court erred in denying his petition for postconviction relief and motion for leave to file a motion for new trial because the trial court's judgments were "based on speculation

that was not supported by the record." Specifically, Walton contends that the trial court's conclusion that McDonnell's handwritten notes demonstrated that Ealom's witness statement and the supplemental police reports were disclosed to defense counsel and that he was therefore not unavoidably prevented from discovering the information contained therein, was not based on any credible evidence but merely speculation. We disagree.

{¶ 50} As discussed above, the notes contain information that accurately summarizes both Ealom's witness statement and the supplemental police reports. Accordingly, no layering of inferences is required to conclude that the prosecutor disclosed the statements and reports to defense counsel. The fourth assignment of error is overruled.

{¶ 51} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

------------------------------------------------------------

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MICHELLE J. SHEEHAN, J., CONCUR